UNITED STATES v. AMERICAN LABORATORIES.

(District Court, E. D. Pennsylvania.   April 27, 1915.)

No. 16.

1. DRUGGISTS ⬤⟞1—STATUTES—VALIDITY.
  The Sherley amendment (Act Aug. 23, 1912, c. 352, 37 Stat. 416 [Comp. St. 1913, § 8724]) to Food and Drugs Act June 30, 1906, c. 3915, § 8, 34 Stat. 771, punishing the making of false and fraudulent statements of the curative properties of medicines, is within the power of Congress to enact.
  [Ed. Note.—For other cases, see Druggists, Cent. Dig. § 1; Dec. Dig. ⬤⟞1.]

2. DRUGGISTS ⬤⟞12—MISBRANDING—CRIMINAL PROSECUTION—CONDITIONS PRECEDENT.
  The giving of the notice provided for by Food and Drugs Act, § 4 (Comp. St. 1913, § 8720), is not a condition precedent to a criminal prosecution for misbranding of a medicine, or for making fraudulent representations as to its curative properties.
  [Ed. Note.—For other cases, see Druggists, Cent. Dig. § 11; Dec. Dig. ⬤⟞12.]

3. CRIMINAL LAW ⬤⟞823—INSTRUCTIONS—MISLEADING INSTRUCTIONS.
  Where, before the charge was delivered, the attention of the court was called to newspaper publications and discussions of the case, and after a conference between counsel and the judge it was agreed that the judge should charge as to the presumption of innocence, and bring before the jury the duty of resting their verdict on the evidence, and to acquit unless the evidence showed guilt beyond all reasonable doubt, and the judge charged at length on the subject, and, if anything, unduly emphasized the rights of accused, accused could not complain of other features of the charge, because keeping the attention of the jury on the question of guilt.
  [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1992–1995, 3158; Dec. Dig. ⬤⟞823.]

4. DRUGGISTS ⬤⟞5—FOOD AND DRUGS ACT—VIOLATIONS.
  One may not be convicted under the Food and Drugs Act, and the Sherley amendment thereto, merely because he advocates a theory of medicine which at the time has not received the sanction of the medical profession; but one guilty of fraud may not escape conviction merely because some one may honestly believe in the theory which he fraudulently sets forth, and the essential difference is one of fact for the jury.
  [Ed. Note.—For other cases, see Druggists, Cent. Dig. § 5; Dec. Dig. ⬤⟞5.]

5. DRUGGISTS ⬤⟞12—FOOD AND DRUGS ACT—VIOLATIONS.
  Whether one was guilty of misbranding a medicine and of making fraudulent statements of its curative properties held under the evidence for the jury.
  [Ed. Note.—For other cases, see Druggists, Cent. Dig. § 11; Dec. Dig. ⬤⟞12.]

6. CRIMINAL LAW ⬤⟞823—INSTRUCTIONS—MISLEADING INSTRUCTIONS.
  Where the court charged, in conformity to the arguments of counsel for accused, that accused, charged with misbranding a medicine, and with making fraudulent statements as to its curative properties, in violation of the Food and Drugs Act and amendment thereto, could not be convicted because the statements made were not believed by witnesses for the United States, and that accused could not be convicted if he en-

tertained an opinion, even if that opinion was a mistaken one, and that the fact that the claims made were within the domain of opinion entitled the accused to an acquittal, accused could not complain that illustrations in the charge were all illustrations of guilt, for the illustrations could not have prejudiced him.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1992–1995, 3158; Dec. Dig. ☞823.]

7. INDICTMENT AND INFORMATION ☞52—AFFIDAVIT.

The failure to attach to an information the affidavits on which it is based does not justify the setting aside of a conviction.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 163–168; Dec. Dig. ☞52.]

The American Laboratories was convicted of violating the Food and Drugs Act and amendment thereto. On motions in arrest and for new trial. Denied.

Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia, Pa.

A. S. Weill and L. Stauffer Oliver, both of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. The prosecution in this case began with an information filed under the Food and Drugs Act and the amendment thereto. The first three counts of the indictment are under the original act, and charge different acts of misbranding, or false and misleading statements respecting the composition of a medicine put out by the defendant under the trade-name of "Bad-Em Salz." The fourth count is under the Sherley amendment to the original act, and charges the offense of making false and fraudulent statements as to the curative properties of the salts manufactured by the defendant.

The case was fully and exhaustively tried and defended, resulting on April 7, 1915, in a verdict of guilty. The motions may be treated as one, and are planted upon four propositions:

[1] The first is an attack upon the constitutionality of the Sherley amendment. The position is taken that it is beyond the power of Congress to make a crime of the act of a defendant in proclaiming his belief in the curative properties of a medicine. The argument upon which this is based is so fully met by the opinions accompanying the ruling in U. S. v. Johnson, 221 U. S. 488, 31 Sup. Ct. 627, 55 L. Ed. 823, that we do not feel called upon to give it further discussion.

[2] The second ground of complaint is that the defendant has not received the notice required by the fourth section of the Food and Drugs Act. This complaint is disposed of by the case of United States v. Morgan et al., 222 U. S. 274, 32 Sup. Ct. 81, 56 L. Ed. 198.

The third complaint is that the indictment was found and tried, and a conviction thereunder had, without other authority for the institution of the prosecution than an information emanating from the office of the United States District Attorney, without affidavits in support of it appearing. The facts are that an information, with supporting affidavits, was filed September 3, 1914. This involved two counts. Another information was filed March 17, 1915. This was the basis of the

four counts involved in the indictment upon which the defendant was convicted. The information was based upon the affidavits previously on file. No affidavits were physically attached to the second information. The discussion of the legal consequences flowing from this is for the moment reserved.

[3-5] The fourth complaint is that the whole trend of the charge was toward conviction, in that it kept the attention of the jury faced in the direction of the guilt, and not the innocence, of defendant. It must be conceded that a reading of the charge affords some ground for this complaint. It is, however, more seeming than real. The circumstances which gave the framing to the charge brought this about. Before the charge was delivered the attention of the court was called to the fact of certain newspaper publications and discussion of the case. The best method of dealing with the situation was made the subject of a conference between counsel and the trial judge. It was not known whether any of the jury had seen the publication referred to. If they had not seen it, a direct reference to it might do more harm than good. It was thought that the condition could be best met by instructing the jury as to the presumption of innocence, and bringing before their minds the responsibility resting upon them to find the facts from the evidence in the case, and to acquit unless the proofs brought home to them a conviction of defendant's guilt beyond all reasonable doubt. The trial judge complied with the suggestion made, and charged the jury at length, and, if anything, at undue length, in emphasizing the defendant's rights of trial. This was done with such fullness at the commencement of the charge that we cannot find that the effect of it was lost upon the jury by anything subsequently said, nor that the defendant was prejudiced by the later features of the charge.

Over and beyond these specific grounds of complaint lies the broader one that there was no evidence in the case to justify the defendant's conviction of a crime. The situation in this view of it may be voiced in the phrase that the defendant, if punished, will have been punished for the crime of medical heterodoxy, and not for any offense against the law. In other words, the president of the defendant company, who is himself a physician, advanced a theory, advocated by others as well as by himself, for the treatment of cases commonly known as "gall stone cases." In opposition are eminent physicians and surgeons, and, as the argument might concede, the weight of scientific medical opinion is against him. Inasmuch, however, as the treatment is the subject of controversy, and its efficacy within the domain of opinion, the minority cannot be convicted of crime merely because they are outnumbered.

It is certainly true that a man should not be convicted of fraud merely because he advocates a theory of medicine which at the time had not received the sanction of the indorsement of the medical profession. It is equally true that a fraud or a fakir cannot escape the consequences of his fraud by the mere fact that some one may honestly believe in the theory which he fraudulently and dishonestly exploits. The broad distinction between things which are frauds and things which are not frauds is clear. It would be difficult, and indeed seems

to be impossible, to give a definition of such frauds in words. Supposititious cases illustrating the distinction could be multiplied beyond number. The essential difference is a fact, and in the administration of the criminal law is a fact to be found by a jury. As applied to the evidence in this case, the statement is easily credible that a man believes in and honestly advocates a course of taking the waters of certain springs as a specific for the prevention of gall stones, in the sense of ameliorating the conditions to which the formation of gall stones are due; it is conceivable that a man may give a like advocacy to the theory that gall stones, when once formed, may be dissolved, and there may be other persons of like opinions with himself.

The views thus expressed and the treatment advocated may be groundless in fact and unsupported by respectable professional opinion, and yet the holder of them would not be the proper subject of criminal prosecution. By the very same token, however, another man might advocate a remedy and put out a medicine to be purchased by the sufferers from ailments or diseases, real or imaginary, and the act itself be so clearly false and fraudulent that the mind would not hesitate to reach a conviction of his criminal guilt. The fact that there was a widely spread disposition among people to give credence to the statement because of a superstitious belief in its efficacy, or indeed such a reputation for the remedy itself as to make people prejudiced in its favor, would not diminish, but would increase, the guilt of him who sought to make money by false statements and fraudulent devices. It is difficult, and indeed practically impossible, to draw a line in the abstract other than a broad line between these two things. There would seem to be no other way of dealing with the subject than to submit to the common sense judgment of a jury to find whether in a given case the acts of a defendant have been honest, however mistaken, or whether they have been false and fraudulent.

The present case may well be considered a test case. There is a widespread belief, whether well or ill founded, in the curative properties of the waters of many of the springs which issue out of the earth. The predisposition to believe in their efficacy may have its foundation in the search for the fountain of youth. Certain words have become polarized with this meaning, and excite a feeling of hope or expectation in the minds of sufferers, particularly those who suffer from certain ailments. The word "Spa" and the word "Bad" are of this kind. The result of the use of such words is very much akin to the thoughts which, from the principle of the association of ideas, are called up by the use of certain widely advertised proprietary words.

In order to determine what basis of merit lies at the bottom of the fame of certain springs, the knowledge and skill of the chemist have been called into exercise, and the waters have been analyzed, and the ingredients which are believed to have contributed chiefly to their efficacy have been determined. It is a short step from this knowledge to the expedient of artificially reproducing the waters, or to the more direct method of bottling and transporting the waters themselves, or to facilitate the transportation by the process of evaporation and then reproducing a water from the residuum salts. Starting with this

widely spread belief in the efficacy of certain natural waters, and following this with the thought of reproduction, either in fact or in equivalents, the defendant put on the market the medicine which it widely sells. Indeed, the president of the company in his testimony gave this history of the evolution of the idea of putting these salts upon the market. The idea began with the recommendation of patients suffering from certain ailments to go to Carlsbad, or to Ems, or to certain other springs, and there take the waters.

The next development of the idea was that a treatment would be given which is the medicinal equivalent of what could be had at the springs themselves. The standard formula for effervescent artificial Carlsbad salts given in the National Formulary was not believed to be the best combination of salts for the purpose. To vary from this, and yet put out the substitute as artificial Carlsbad salts, was thought to be inimical to the provision of the statute. The fully developed thought was to put out another combination of salts, believed to be a reproduction, and in that sense a representation, and in another sense an equivalent, of the medicinal properties of the Carlsbad waters. The embodied thought was therefore put into this product under the name of "Bad-Em Salz." This put behind this proprietary medicine the widespread belief of people in the efficacy of these natural spring waters, and the thought that they could get the same benefit from a treatment in their own homes which they would receive directly from the Carlsbad or Bad-Ems waters. The further thought was to give the sale of these salts the additional boost of a statement of their curative or therapeutical properties. Had this been fairly done, it could not be said that there was involved in it any infraction of any criminal statute.

The charge against this defendant, however, was that the medicine was misbranded in the respect that it was put out under certain false and misleading statements, the essence of which were that the impression was conveyed to the users of the medicine that they were getting the benefit of the very salts which are contained in the natural waters of the springs which had acquired a world-wide fame, and that false and fraudulent statements were made as to the curative effects or results which would flow from the use of this medicine. Right here is the fulcrum on which the lever for the argument on behalf of the defendant is sought to be placed.

As to the misbranding features of the indictment, the defensive position is taken upon the fact that the statements put out by the defendant were neither false nor misleading, and, with respect to the curative features, that, inasmuch as the result claimed to follow from the use of the medicine was a matter of opinion, there was no basis for a finding of guilt.

The answer made to these propositions by counsel for the United States is the only answer to which they are open, and that is that the statement of fact upon which the first proposition turns is one to be determined by a jury. It is not a necessary condition of a finding of guilt that the statement of what the drug is should be a statement flatly and baldly false, but that the word "misleading," in the act, has its function, which is to bring the statement within the inhibition of the

statute if it is such as to create or lead to a false impression in the mind of the reader as to what the ingredients or the composition of the drug are. This is the charge made in the first three counts of the indictment, and this is the fact which the jury has found against the defendant.

With respect to the charge under the Sherley amendment, the answer of the United States is that a man who has in fact made false and fraudulent statements as to the curative properties of the drug which he is selling cannot, when pursued by justice, take refuge in the statement that he was expressing his opinion, or in being able to find others who honestly believed in the statements made. Here again the question of guilt or innocence turns upon the fact, and here again the fact is one which must be determined by the jury, and here again the jury has determined the fact against the defendant.

[6] The charge of the court in this feature or aspect of the case was heard by the jury, and therefore must be read in the light of the argument which had been addressed to them. The president of the company, when upon the witness stand, testified to the honesty of the statements made and to the truth of the claims made for the results of the treatment advocated. This was impressively supported by counsel for the defendant in his argument that the defendant was not to be convicted because the statements made were not believed in by the witnesses called for the United States, and that a defendant could not be convicted because he entertained an opinion, even if that opinion was a mistaken one, and that the fact that the claims made were within the domain of opinion entitled the defendant to a verdict of acquittal.

These propositions were all affirmed by the court, unless the jury had been convinced by the evidence in the case that the statements as to what the drug was were in fact false and misleading, and unless the statements of what it would do were both false in fact and were fraudulently made.

The feature of the charge complained of, that the illustrations "were all illustrations of guilt, and none of innocence," could not have prejudiced the defendant, for the reason that, following the course of the argument made by counsel for the defendant, they enforced his argument and reinforced his position by impressing upon the jury that there could be no conviction unless the defendant had been guilty of an arrant fraud, such as those embodied in the illustrations given.

[7] This brings us back to the only undiscussed complaint now made. That no one can be called upon to defend to a criminal charge which is not based upon reasonable grounds appearing from statements of fact authoritatively made and sanctioned by the oath of some one who has a knowledge of the facts, or its legal equivalent in solemnity and responsibility, is a proposition having behind it the highest sanction of the law. The forms of practice in making criminal accusations which have grown out of this are the outer protections which are thrown around every citizen, and there can be no departure from them.

We have not had the opportunity to examine the record in this case with respect to the fulfillment of these conditions preliminary to a trial.

We understand the fact to be, however, and it is stated without denial, that the action of counsel for the United States in bringing this prosecution was based upon affidavits made by those having a knowledge of the facts and upon the probable cause which was disclosed by the affidavits. These affidavits are of record. The first information brought home to the defendant charges which would have taken the form of two counts in an indictment. Counsel for the United States subsequently amplified the form of the charges by putting them into the shape of the four counts of the present indictment. The information in the present prosecution was based upon the affidavits which were of record. The complaint now made, as we further understand it, is merely to the feature that the affidavits upon which the information was based are not physically attached to the information itself. We do not think this to afford any legal reason for interfering with the verdict, although we have no wish to lessen the protection thrown around defendant. U. S. v. Gruver (D. C.) 35 Fed. 59, and U. S. v. Baumert (D. C.) 179 Fed. 735, dispose of this phase of the case.

The motive and policy of the law which lies behind legislation of this general kind is highly promotive of public good. The evils sought to be removed and prevented spring out of conditions requiring tactful, and even delicate, treatment. Such laws, if arbitrarily enforced, may easily take the form of an unwise dictatorial interference with the pursuits of others. There is a natural temptation to overdo by trenching upon the domain which properly belongs to the ethics of the medical profession. There is danger, also, that the public will come to rely upon the protection promised by such laws, and therefore relax individual watchfulness. Such laws, therefore, should be administered in such a way as that honest and well-intentioned business may not be hampered, but the detection of frauds and cheats will be made sure, and their conviction and punishment rendered certain. The temptation even to those who cannot fairly be termed unscrupulous is to yield to the suggestions of greed and come as close to the forbidden line as they safely can. The only sure course in the administration of laws of this kind is to leave the determination of guilt or innocence in a given case to the sound judgment of a jury, supervised by the wisest scrutiny which the trial judge can give to make sure that no one is convicted without guilt. As has already been stated, this case discloses acts that are not far over the line of what the defendant might lawfully have done. The jury found, however, that it has transgressed that line, and we are not able to convict the jury of having misjudged the real facts in the case.

The motion in arrest of judgment, and that for a new trial, are therefore both denied.