**UNITED STATES v. COMMERCIAL CREAMERY CO.**

CREAMERY CO.

No. C—7382.

District Court, E. D. Washington, N. D.

March 12, 1942.

Lyle Keith, U. S. Atty., and Harvey Erickson and R. Max Etter, Asst. U. S. Attys., all of Spokane, Wash., for plaintiff.

Roy E. Lowe and J. Orville Humphries, both of Spokane, Wash., for defendant.

SCHWELLENBACH, District Judge.

By information defendant is charged with introducing into interstate commerce in Spokane, Washington, for shipment to Portland, Oregon, two shipments of frozen eggs which consisted in whole or in part of a decomposed substance in violation of the Federal Food, Drug and Cosmetic Act. The pertinent portions of the statute, grouped together for continuity purposes, read as follows, Title 21 U.S.C.A.:

Section 331:

"The following acts and the causing thereof are prohibited:

"(a) The introduction or delivery for introduction into interstate commerce of any food \* \* \* that is adulterated \* \* \*."

Section 333:

"(a) Any person who violates any of the provisions of section 331 shall be guilty of a misdemeanor."

Section 342:

"A food shall be deemed to be adulterated—

"(a) \* \* \* (3) If it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food."

To the information a plea of not guilty was entered. By stipulation, a jury was waived and the case presented to the Court. By stipulation, the interstate character of the shipments and their identity was admitted by defendant.

Defendant contends that the failure to afford to the defendant an opportunity to present its views as provided in the act, 21 U.S.C.A. § 335, prevents this prosecution. This contention is without foundation. The notice and hearing required in section 335 is administrative and not jurisdictional. United States v. Morgan, 222 U.S. 274, 32 S.Ct. 81, 56 L.Ed. 198; United States v. American Laboratories, D.C., 222 F. 104.

Defendant contends that the statute is too indefinite and that neither it nor the regulations promulgated under it establish standards sufficiently definite to enable the defendant to know of the crime with which it is charged and that any reasonable doubt as to the meaning of the statute must be construed in favor of the defendant. It is true that this is a criminal proceeding in which the burden of proving the allegations of the information beyond a reasonable doubt rests upon the Government and the defendant is entitled to its recognized presumption of innocence. United States v. Mayfield, D.C., 177 F. 765; Von Bremen v. United States, 2 Cir., 192 F. 904; United States v. American Laboratories, supra; United States v. Newton Tea & Spice Co., D.C., 275 F. 394. But the rule of strict construction as to the statute itself has little or no application to the Federal Food, Drug and Cosmetic Act designed, as it is, to prevent injury to the public health. A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542; United States v. 48 Dozen Packages, More or Less, of Gauze Bandage Labeled in Part Sterilized, 2 Cir., 94 F.2d 641; United States v. Research Laboratories, Inc., 9 Cir., 126 F.2d 42, decided Feb. 24, 1942. Furthermore, the statute is not indefinite or ambiguous. It makes illegal the introduction into interstate commerce of food which "consists in *whole or in part* of any filthy, putrid, or decomposed substance." (Emphasis mine.) This statute is all inclusive and prevents the shipment in interstate commerce of any food which contains any decomposed matter. Defendant urges that such a construction of the statute would result in unreasonable regulation and would prevent the shipment in

interstate commerce of many foods not harmful to public health. If such a contention is sound, the argument in support thereof should be made to the Congress and not to the Courts. The act was passed by Congress, under its authority to exclude from interstate commerce impure and adulterated foods and to prevent the facilities of commerce being used to enable such articles to be transported to the people who consume them and it is in the light of the purpose and of the power exerted by Congress that this act must be considered and construed. Hipolite Egg Company v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364. Congress may itself determine the means appropriate to this purpose and, so long as they do no violence to other provisions of the Constitution, it is, itself, the judge of the means to be employed in exercising the powers conferred upon it in this respect. McDermott v. Wisconsin, 228 U.S. 115, 33 S. Ct. 431, 57 L.Ed. 754, 47 L.R.A.,N.S., 984, Ann.Cas.1915A, 39. "Congress, following its own conception of public policy concerning the restrictions which may appropriately be imposed upon interstate commerce, is free to exclude from the commerce articles whose use in the states for which they are destined it may conceive to be injurious to the public health, morals or welfare. * * * The distinction on which the decision [Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724] was rested that Congressional power to prohibit interstate commerce is limited to articles which in themselves have some harmful or deleterious property—a distinction which was novel when made and unsupported by any provision of the Constitution—has long since been abandoned." United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 457, 85 L.Ed. 609, 132 A.L.R. 1430.

Plaintiff's testimony in this case consists of evidence submitted by three witnesses, all employees of the Food and Drug Administration. They were the inspector and assistant inspector at Portland, Oregon, who made the seizure, and the chief inspector at Seattle, who verified their findings. Their method of inspection consisted exclusively of the use of the organoleptic (affecting an organ or organs, especially those of touch, taste and smell. Funk and Wagnell's New Standard Dictionary, 1940 edition) test. In this case, they used the sense of smell. In each instance, the witness testified that his training in the use of this test consisted of a three weeks course in California. While there they had made up for them "authentic packs" of various food substances using which they were taught to differentiate between the odor emanating from each. It will be noted that such packs were designated "authentic" rather than *proven*. For example, in making up an "authentic" egg pack, the eggs used were not submitted to any chemical or bacteriological test but were taken from what the witnesses described as "known" sources of either good or bad eggs and the odors were described to them as those which would come from either good or bad egg packs. The samples upon which plaintiff relies in this case were not subjected to either bacteriological or chemical tests nor was the method of inspection of the source used.

Defendant's testimony included an explanation of the care used by it in the preparation of these shipments. It was uncontradicted that the eggs were carefully selected and examined by skilled candlers. They were broken in the approved fashion, using recognized methods by experienced breakers, into cups where they were judged as to appearance and smell by the breaking-room foreman who has had eleven years experience. He testified that they were not decomposed. They were then churned and rushed to refrigeration. Plaintiff makes no contention about this breaking-room operation. The defendant also offered the testimony of a witness in Portland who was present at the time of the seizure there by the Department's inspector. He, too, had had long experience in detection of odors of frozen eggs. He testified he could detect no odor of decomposition. Plaintiff also submitted the testimony of a witness now connected with the Washington State Department of Agriculture. He, likewise, had had many years of experience in the egg business. He testified that the organoleptic method of testing was more efficient if used at the time of breaking than if used later at the time of seizure.

■ It is not the function of the Court in this case to make a choice for the Food and Drug Administration as to the method of testing to be followed by it. My problem is only to determine whether the Government has sustained the burden of establishing its case beyond a reasonable doubt. However, there are certain facts

disclosed in the evidence and of which I have knowledge which I cannot overlook in deciding this case. They are:

1. That eggs have a peculiar propensity for the acquisition of odors from many and varied sources; for example, the food which the chicken eats, the place where the egg is laid, the place at which and the method used in storing the eggs, all have their effect upon the odor of the egg.

2. One of the most efficient methods of determining the presence or absence of decomposition in egg products comes from inspection at the source. The Department of Agriculture recognized this during the time that the Food and Drug Administration was a part of that Department. (Agricultural Year Book, 1924, pages 438 and 439). This was more specifically recognized by the Department in 1939. (Agricultural Year Book, 1939, p. 345).

3. The determination as to whether an egg contains decomposed substance is much more difficult than a similar determination as to most any other food product. As it was put by Allen in his work on Commercial Organic Analysis by Chemists, 5th Ed., Vol. IX, p. 557:

"A chemist who is called in to examine eggs or pass judgment on their quality must of necessity be an egg expert since their examination presents rather greater difficulties than other food products."

4. I do know that for years chemists have been seeking more efficient and rigid methods for the determination of the presence of decomposition in eggs. One need only study the reports of the Association of Official Agricultural Chemists to become aware of this effort. See Journal of the Association of Official Chemists, Vol. XX, p. 159 (1937); Vol. XXI, p. 179 (1938); Vol. XXII, p. 298 (1939); Vol. XXIV, p. 119, (1941); Vol. XXIV, p. 319 (1941). In most of these studies, representatives of the Food and Drug Administration participated either as referees or associate referees. It is difficult for me to believe that if the organoleptic test is as efficient as plaintiff's witnesses say that such complete and consistent efforts were being made by the chemists to acquire rapidity in their processes.

5. What is true of the chemists is also true of the bacteriologists. While their conclusions must necessarily be merely quantitative, nevertheless I doubt whether the American Public Health Association would have interested itself to the extent

that it has in the bacteriological studies if plaintiff's contention as to the scientific efficiency of the organoleptic method is true. At least it may be said, as was said by the Committee on Microbiological Methods of Food Examination of the American Public Health Association, February, 1938, "Criticism has been raised of the use of bacterial counts in the examination of food products on the grounds that it contributes nothing to our knowledge of quality and that organoleptic tests are equally reliable, less expensive and much more rapid. The development of bacterial standards for frozen eggs can be compared to the extensive efforts now being made to determine the exact physical and chemical properties that constitute good eggs. As the properties are understood, they will be interpreted in terms of appearance before the candle and candling must remain the practical means of examining interior egg quality. Thus, bacterial counts will serve as a basis for the establishment of the limit of quality of frozen eggs." Journal, American Public Health Association, Vol. XXVIII, p. 56.

6. It must be conceded that the use of the sense of smell as a medium of discovering the imperfections in food products is of such recent development as to make it doubtful whether it may be used as an exclusive standard by which the presumption of innocence may be overcome in a criminal case. Dr. Eric Ponder, writing in the London scientific magazine Discovery for March, 1926, said this: "The sense of smell is one of those little islands untouched by the advance of science, unclaimed for its proper use. We do not know how the olfactory organ functions. We know little about olfactory memory, we do not know enough about the potentialities of the sense to apply it usefully." We do know that the olfactory nerves are just as efficient as the optic or auditory nerves. The difficulty lies in the fact that our conscious use of them is so less frequent. To put it another way, we may smell as frequently as we see or hear, but we do not sniff nearly as frequently as we look or listen. The problem is not one of sensitivity but rather of selectivity. Consequently, skill in the art of detection through the sense of smell comes from experience rather than aptitude.

■■ Counsel for plaintiff vigorously objected that I even permit the introduction of the testimony of the foreman of

the defendant's egg-breaking plant with his eleven years experience in the detection of odors in eggs. This, for the reason that he didn't have a college degree in science. The rule that expert testimony is not conclusively binding upon the Court applies in pure food and drug cases as well as any other case. United States v. 17 Bottles, Large Size, and 65 Bottles, Small Size, More or Less, of an Article of Drugs Labelled in Part "B. & M." D.C., 55 F.2d 264. Furthermore, I can see nothing in a three weeks course of training in the organoleptic method, even when taken by men possessed of degrees of Master of Science and Doctor of Philosophy, which would justify me in arbitrarily accepting their testimony as against men who have had years of experience in the practical use of that very method. I do not suppose the foreman of the breaking plant, either when he was a candler or a smeller, even dreamed that he was using the organoleptic procedure. That, however, did not prevent him from developing the attribute of selectivity either in looking or smelling.

Plaintiff's chief inspector justifies the exclusive use of the organoleptic test on the ground that it is quicker and permits more territorial coverage than could be obtained by the combined use of this method with any one of the other three. I fully recognize the need for speed so far as the stoppage of shipments of decomposed food is concerned. Clearly, if the Administration's inspectors were compelled to wait until they have made either an inspection of the source or the chemical or bacteriological tests before making a seizure, public health might be endangered. I recognize that it is not likely that any one chemical method can be developed to detect and evaluate the spoilage in eggs in view of the limited, well-defined bio-chemical task of the microbial species. However, this is not merely a question of seizure. This is a criminal case in which the Government is confronted with the burden of proving its case beyond a reasonable doubt. The seizure in this case was made in January, 1941. The information was not filed until December 31, 1941. There was nothing to prevent the Government from having made certain as to the condition of these shipments by taking advantage of any one of the three additional tests.

I am convinced from all of the testimony that the plaintiff has failed to sustain the burden that rests upon it in this case. To my mind, it has failed to overcome the presumption of innocence to which the defendant is entitled. Consequently, I must find that the defendant is not guilty of the violations charged in the two counts of the information and direct that this action must be dismissed.