## UNITED STATES v. 1851 CARTONS, MORE OR LESS, ETC.

### No. 11605.

District Court, D. Colorado.

May 22, 1944.

Bart W. O'Hara, Asst. U. S. Atty., of Denver, Colo., for plaintiff.

Hyman D. Landy, of Denver, Colo., for defendant.

SYMES, District Judge.

The defendant-claimant at the end of the Government's case moved to dismiss the libel on the ground that the Government's evidence does not sustain the charge.

After considerable argument the court granted the motion, stating its reasons, upon the condition that the claimant give bond that in the selling or disposition of any of this fish they give to the retailers written notice calling attention to the fact there had been found in the shipment an occasional bad fish, and the retailer before selling or delivering it to any customer should warn the purchaser to examine it himself. This was agreed to by both sides in open court, and a written notice was duly prepared and agreed to, consisting of a rubber stamp containing such a notice to be affixed to every carton or box as it left the possession of the claimant.

Later the Government, for good and sufficient reasons I presume, withdrew its consent to this arrangement and has asked for a clear decision on the merits. The

court therefore withdraws the above memorandum and substitutes the following in passing upon the motion.

The charge is that contrary to § 331, Tit. 21 U.S.C.A., the defendant introduced 1851 cartons, more or less, each containing 15 pounds of frozen whiting (fish), into interstate commerce by transporting it from Provincetown, Massachusetts, to Denver, Colorado. That said article of food was adulterated within the meaning of § 342(a) (3), Tit. 21 U.S.C.A., in that it consisted "in whole or in part of a decomposed substance".

Said § 342(a) (3), Tit. 21 U.S.C.A., says, "a food shall be deemed to be adulterated" as the libel charges (3), "If it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food." The Government has left out of its charge the last part of the subsection as follows, to wit, the words "or if it is otherwise unfit for food."

■ On this motion we are required to consider the Government's evidence only giving it full value as uncontradicted.

Our decision of this motion necessarily depends upon the testimony of the Government experts. The chief Government witness, Dr. Lewis Chernoff, is a graduate chemist employed for many years by the U. S. Food and Drugs Administration in Denver. Dr. Chernoff has appeared in this court many times in similar cases and we entertain a very favorable opinion of his ability. He testified he has examined fish products for many years, and on November 9 and 10, 1943, examined 26 boxes taken as samples from this shipment, seized by the Government while in a cold storage plant in Denver and taken to Dr. Chernoff's office. The fish when delivered to him were in hard, frozen blocks. He opened the cartons, put the fish in trays permitting them to thaw out overnight. Next day he examined each fish separately by cutting or slitting it down the back and smelling. This is known as the organoleptic test.

In many of the boxes he did not find any decomposed or bad fish at all. Out of a total of 1119 fish he found 55 or 4.9% decomposed. By decomposed he meant rotten, unfit for human consumption. His test—the only one he made—was his sense of smell, the odor being very offensive. The following questions and answers are informative:

"Q. If someone had eaten them what effect would it have had? A. I don't know. If they were cooked they probably might be all right.

"Q. What? A. If they were cooked and eaten they might be all right. They might cause illness. I have no idea".

He said the balance of the fish outside of the 55 were all right.

On cross-examination he testified that whiting was a salt water fish and when received, were headless and gutted. That he made a personal examination of every one of the 1119 fish. That of those he examined the skin appeared to be normal and firm. That he made no notes on the physical condition of the fish. He did not make a bacteriological examination or chemical test, but simply organoleptic; that is a test by the senses of smell, sight, touch and taste. He did not make an indol test—indol being one of the by-products of decomposition of protein products and might determine decomposition. His test consisted simply of subjecting the 1119 fish to his sense of smell. Further, to sum up, of the 1119 fish so examined 55 smelled bad or putrid, and the balance were edible.

On being recalled the witness testified he examined another 18 boxes of this same shipment on January 25th. Like the other examination they were frozen. He opened the boxes and placed the fish on pans allowing them to thaw overnight. He examined them the next morning. That out of the total of 768 fish 48 were unfit for food, or 6.2% by count. The only test he made was the organoleptic; that is he judged them solely by the smell.

At the trial of the case—and at the request of counsel for both sides—additional samples of the whiting were brought in to a room adjoining the court and opened up and examined by Dr. Chernoff and the court. The results of this examination are shown in Govt. Ex. A, signed by Mr. Williams, defendant's expert Mr. Vincent, head of the Food and Drug Division office in Denver and Dr. Chernoff. Four hundred and eleven fish selected at random were examined in the presence of the court and the average per cent of bad fish found therein by Dr. Chernoff was 3.6%; that is to say 15 out of 411 fish, it was agreed, were unfit, showing signs of decomposition. The court found these upon personal examination to have a bad, disagreeable, putrid odor.

While the sole question in the case, under the pleadings, is whether the fish consisted wholly or in part of a decomposed substance, the over-all question of course is whether they were fit for human consumption.

It will be observed from Dr. Chernoff's testimony that the number of decomposed fish in the first exhibit unfit for human consumption was less than 5%, and of the second lot examined in January was a little over 6%. No witness qualified to or attempted to state what the effect of eating any of these decomposed fish would have upon the consumer. Dr. Chernoff did testify that the housewife would, in processing these fish before serving them, have ample opportunity to detect any bad odor. He said the cooking they would be subjected to might in most instances eliminate any danger of food poisoning. Furthermore, it would seem that the effect on the human system if consumed as food would depend largely upon a bacteriological test, which in this case was not made.

United States v. Commercial Creamery Co., D.C., 43 F.Supp. 714, involved frozen eggs. The testimony of the Government was that of three witnesses who inspected the eggs sought to be condemned. They used the organoleptic test only, and while the case was a criminal one where the Government's allegations must be proven beyond a reasonable doubt, the court on such testimony dismissed the action, recognizing that the organoleptic test was justified only because it was quicker and, as the Government inspector testified, permitted more territorial coverage than could be obtained by the combined use of this method with any of the other three. The court noted that chemists had for years been seeking more efficient and rigid methods for determining decomposition in eggs, citing authorities, and observed that it was difficult for the court to believe that if the organoleptic test is as efficient as the Government witnesses said it was, that such complete and consistent efforts were being made by the chemists to acquire rapidity in their processes. And further stated that what is true of the chemists is also true of the bacteriologists, and stated it doubted whether the American Public Health Association would have interested itself to the extent that it has in bacteriological studies if the Government's contention as to the scientific efficiency of the organoleptic method were correct.

In the case at bar the organoleptic test made by the Government's chemist in the presence of the court was that less than 4% of the fish in question were decomposed, and according to Dr. Chernoff this might be very greatly reduced by the processing that the fish would undergo in the house before being consumed.

In United States v. Two Hundred Cases of Catsup, D.C., 211 F. 780, at page 782, it says: " * * * there is no fixed standard by which it can be determined when a product has reached such a state of decomposition as to 'consist in whole or in part of filthy, decomposed, or putrid vegetable substance,' * * * I infer from the testimony of the experts that it would be difficult, if not impossible, to fix any arbitrary standard by which the question could be determined, as it depends upon so many contingencies. In any event, no such standard has been fixed, in the absence of which each case must be determined on its own facts."

And in A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542, at page 545, it is said: "It appeared from the cross-examination of the government witnesses that they have heretofore suffered canned salmon containing a small percentage of filthy, decomposed, or putrid matter to pass in interstate commerce unchallenged, but there is no room for controversy over percentages under the statute itself, for it excludes all. Of course, where the entire product is not inspected or tested, the proof must go far enough to satisfy the court or jury that the adulteration extends to the whole product sought to be condemned." See also Baker v. Latses, 60 Utah 38, 206 P. 553.

I find no case that holds an entire shipment, such as the one at bar, can be condemned merely upon a finding that a percentage as small as the evidence here is decomposed, especially where there is no charge or evidence that the fish is unfit for food.

In United States v. Two Hundred Cases, More or Less, of Canned Salmon, D.C., 289 F. 157, Judge Hutcheson—then a District Judge—discussed this whole question and refused to follow the Andersen case, stating that while proof that the contents of 20 per cent of cans in a shipment were adulterated with nothing more, might authorize the inference the whole product was bad, and therefore support a condemnation of the lot where the same proof

which establishes the adulteration of one-fifth establishes the lack, of adulteration of the balance, the Government must fail, except as to the cans identified as adulterated. The court analyzed the testimony —which was about the same as in the case at bar—and stated the Government evidence proving part bad, and relied on for the inference that all was bad, proved just as conclusively that part of it was not bad within the meaning of the statute; that if the Government depended for its condemnation upon subdivision 6 of § 7 of the Act, 21 U.S.C.A. § 8, in accordance with the general rule of law that the burden is upon the Government to prove its case, the Government would have to be case in this suit, or would have to take the alternative of examining and testing every can of the shipment. That view is applicable to our situation. The testimony of Dr. Chernoff proves that except for the number of bad fish found, the balance of the shipment which he examined was all right and fit for human consumption.

C.J.S., vol. 36, Food, § 16, p. 1076: "Statutes and ordinances intended to prevent the manufacture or sale of food or food products that are unwholesome or unfit for human consumption will be enforced in accordance with their proper construction. * * * or by reason of their decay", [Commonwealth v. Prince, 203 Mass. 602, 89 N.E. 1047] "The statutes are not intended to regulate tastes or appetites, and the courts will not deem an article of food unwholesome merely because it is unpalatable to many, or even most, persons." [McNeill & Higgins Co. v. Martin, 160 La. 443, 107 So. 299]. "Furthermore, an article of food is not unwholesome, within such a statute, merely because it is unwholesome to a particular individual or to normal persons under abnormal conditions; it must have such qualities that normal persons generally, in a normal condition, would be adversely affected by its consumption. It has been said that the condition of a product in the hands of a consumer is the place and time to test its fitness for food;" [United States v. Four Hundred and Forty-Three Cans of Frozen Egg Product, 3 Cir., 193 F. 589].

And according to § 15, p. 1073: "* * * an article of food shall be deemed adulterated * * * ·if it contains any poisonous or deleterious substance which may render it injurious to health [United States v. 1232 Cases American Beauty Brand Oysters, D.C., 43 F.Supp. 749], or contains any added substance or ingredient which is poisonous or injurious to the health, * * * or consists in whole or in part of a filthy, decomposed, or putrid substance", [Knapp v. Callaway, D.C., 52 F.2d 476; United States v. Commercial Creamery Co., D.C., 43 F.Supp. 714; United States v. Sprague, D.C., 208 F. 419].

C.J.S., vol. 36, Food, § 15, Note 61, p. 1074: "The word 'decomposed,' as used in such a statute [referring to the Federal statute], means more than the beginning of decomposition; it means a state of decomposition." See also 26 C.J. p. 762, Note 76; and A. O. Andersen & Co. v. United States, 9 Cir., 284 F. 542, infra.

In A. O. Andersen & Co. v. United States, supra, a food case, 408 cans of salmon were selected at random from 408 of 1974 cases. One hundred forty-four cans of the second lot were first analyzed and found to contain 28 putrid or tainted, and 18 stale cans, and 48 of the balance were later analyzed and found to contain eight putrid or tainted, and one stale can. The third lot of 192 cans contained 35 putrid or tainted, and 12 stale cans. That a putrid or tainted can was said to be one that contained rotten or decayed salmon with an offensive odor, while a stale can was disclosed as the beginning of decomposition, but not in so far advanced a stage as the putrid or tainted cans. The net result was that one-fifth of the product analyzed was putrid or tainted and one-fourth either putrid and tainted, or stale. It further appeared that decayed salmon was not injurious to health.

The claimant offered no testimony and upon its motion the court directed a verdict in its favor, which was reversed by the Court of Appeals, which said that decomposition begins when life ends, but meat and fish are not decomposed at that early stage. Decomposed means more than the beginning of decomposition, it means a state of decomposition, and the statute must be given a reasonable interpretation to carry out the legislative policy or intent.

In United States v. Commercial Creamery Co., supra, it was held that the Federal Food, Drug, and Cosmetic Act is designed to prevent injury to the public health and the introduction into interstate

commerce of foods which consist in whole or in part of any filthy, putrid or decomposed substance, and the intent of Congress was to exclude from interstate commerce impure and adulterated food, and to prevent facilities of commerce from being used to enable such articles to be transported to people who consume them. And it is in the light of such power exerted by Congress that the Act must be construed.

In conclusion: The Government's testimony proves that a very small percentage of the entire shipment (less than 6 per cent) was decomposed and the balance (95 per cent plus) was all' right. There is no evidence that even the bad fish was sufficiently decomposed to violate the object of the statute, to wit, to prevent the introduction into interstate commerce of food unfit for human consumption. Further under the authorities (supra), the testimony, to say the least, throws considerable suspicion on the efficiency of the organoleptic test alone as justifying the condemnation of the entire shipment.

The motion for a directed verdict is granted and the libel dismissed.