UNITED STATES v. 43½ GROSS RUBBER
PROPHYLACTICS LABELED IN PART
"XCELLO'S PROPHYLACTICS" et al.

Civil Action No. 1502.

District Court, D. Minnesota,
Fourth Division.

Feb. 11, 1946.

Victor E. Anderson, U. S. Atty., and Clifford F. Hansen, Asst. U. S. Atty., both of St. Paul, Minn., for the United States.

Maurice Weinstein, of Milwaukee, Wis. (Ralph Stacker, of St. Paul, Minn., of counsel), for claimant.

NORDBYE, District Judge.

A libel of information was filed against the goods described in the caption on the theory that they were adulterated within the meaning of 21 U.S.C.A. § 351(c) and that they were misbranded within the meaning of 21 U.S.C.A. § 352(a). The goods were labeled "Prophylactics" on the carton in which they were contained, and the Government contends that such labeling constitutes misbranding within the meaning of the Act. The articles consist of certain rubber devices sold ostensibly for the purpose of preventing transmission of venereal disease. The government witnesses testified that, of the Xcello brand, 180 were tested and 14 contained holes; that 228 of the Silver-Tex brand were tested and 16 contained holes. Medical witnesses testified that the defective devices would not serve as a means for the successful prevention of the transmission of venereal disease.

Section 351 provides:

"A drug or device shall be deemed to be adulterated—* * *

"(c) If * * * its strength differs from, or its purity or quality falls below, that which it purports or is represented to possess."

Section 352 provides:

"A drug or device shall be deemed to be misbranded—

"(a) If its labeling is false or misleading in any particular."

The government inspection has established that the devices tested were defective in the number indicated, and there can be no serious doubt that the strength and quality of these particular defective articles fell below that which they purported or were represented to possess. Furthermore, it seems clear that, being labeled "Prophylactics", there was misbranding within the meaning of the statute. These defectives devices are not efficacious in furnishing protection from disease.

The problem presented, however, pertains to the right of the Government to condemn the entire shipment. It appears that on or about June 19, 1945, about 43½ gross of the Xcello brand and 112½ gross of the Silver-Tex brand were shipped from the manufacturer in Akron, Ohio, to a concern in Minneapolis. It is from this shipment that the samples were taken and the tests made, as stated above. The Government took two samples—a pre-seizure and a post-seizure. While the method by which the first sample was taken is not entirely clear in the record, it does appear that, in taking the post-seizure samples, the Government took one dozen articles from each of the 36 gross cartons of Xcellos, and from the three gross so selected 72 samples were taken at random. Six, or about 8 per cent of the 72, were found to be defective. In the pre-seizure test of the Xcello brand, 108 were selected and 8 were found to be defective, or about 8 per cent. The post-seizure samples of the Silver-Tex brand were obtained by substantially the same method of selection by which the Xcello post-seizure samples were selected. In the

post-seizure test of this brand, 120 samples were taken; four, or 3.33 per cent, were defective. In the pre-seizure test of this brand, 108 were tested and 12 were defective, or approximately 11.11 per cent. The average defects, therefore, of all the tests is approximately 7.37 per cent. But of the entire shipment seized, a fraction of one per cent is definitely shown to be defective, and claimant contends that the Government has failed to sustain the burden of proof which rests on it in these proceedings in its attempt to condemn the entire shipment. It should be pointed out that apparently the only practical tests which the government representatives are able to make with the facilities available to them results in the article's being rendered useless after the test has been made. Concededly, the burden of proof rests upon the Government. United States v. 5 One-Pint Bottles, et al., D.C. N.Y., 1934, 9 F.Supp. 990; United States v. 11¼ Dozen Packages, D.C.N.Y., 1941, 40 F.Supp. 208. But it does not follow that each individual article in the shipment must be tested. Inspection and condemnation on the basis of samples tested is clearly contemplated by the Act. In fact, the Act speaks of samples and their availability for testing. 21 U.S.C.A. § 334(c). And the cases seem to contemplate that testing of samples is sufficient if the samples are representative ones. Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542; United States v. 200 Cases et al., D.C.Tex. 1923, 289 F. 157. No serious question is raised in this proceeding as to the samples taken being representative. But claimant contends that the Court cannot order the condemnation of good articles, and concededly some of the remaining articles are in all probability free from defects. However, in urging this contention, claimant fails to distinguish between condemnation and the confiscation or sale of goods. Condemnation only sustains the Government's position that the goods as they were composed in interstate shipment violate the provision and purpose of the Federal Food, Drug, and Cosmetic Act. After the decree, the claimant can separate the good from the defective if it posts a bond, and thereby will be able to retain the balance of the goods. 21 U.S.C.A. § 334(d). The very fact that part of the section of the Food and Drug Act which governs condemnation and confiscation procedure contains a section which permits the separation of the acceptable from the defective goods after condemnation indicates an intent and recognition by Congress that some of the shipment may not violate the Act, but nevertheless would be subject to a decree of condemnation together with the defective merchandise. In view of the fact that the tests which the government representatives have applied render the articles useless, it is highly improbable that the statute intended that only the defective articles are to be condemned. The impracticability of such a libel action is obvious and the impracticability of such a construction also seems clear. In effect, it would prevent application of the Act to many situations to which Congress intended it to be applied. But it is urged that the number of defectives are so low in proportion to the total number of articles involved in this proceeding that a grave injustice would result to the claimant if the entire shipment is condemned. Again, it may be reiterated that condemnation is not necessarily confiscation, and that representative sampling is permitted by the Act. Moreover, the Court is not required or permitted to establish any formula as to what tolerance of defects should be allowed, if any, in every type of libel proceeding before it determines that the Government has sustained the burden of proof as to any particular shipment. Suffice it to say that, on the state of the facts herein, and assuming that the same ratio of defectives would be found in the entire shipment, it would follow that over 1,500 defective articles would be found in this shipment. Such a number, if sold on the market, would constitute a potential menace to public health, and, in view of the claimed purpose and object of the devices, that is, the prevention of disease, are sufficient to sustain the libel proceedings herein.

■ The purpose of the Federal Food, Drug, and Cosmetic Act requires that the Act be interpreted liberally. "One of the declared purposes of the Federal Food, Drug and Cosmetic Act is to prohibit the

movement in interstate commerce of adulterated and misbranded foods, drugs, devices and cosmetics. United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134 [88 L.Ed. 48]; * * *." United States v. 1,851 Cartons, etc., 10 Cir., 1945, 146 F.2d 760, 761. Thereby Congress hoped to "prevent injury to the public health," United States v. Research Laboratories, 9 Cir., 1942, 126 F.2d 42, 45, by prohibiting "the sale of inferior for superior articles," United States v. 200 Cases, etc., D.C.Tex.1923, 289 F. 157, 158, and protecting the uninformed from buying an article which was different from what it purported to be. United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 409, 34 S.Ct. 337, 58 L.Ed. 658, L.R.A. 1915B, 774; United States v. 5 One-Pint Bottles, etc., D.C.N.Y.1934, 9 F. Supp. 990. If claimant's contention were adopted here, this purpose could not be carried out, for the practical difficulties involved would permit defective articles to move in commerce and to be sold to uninformed persons without affording the protection represented.

The Circuit Court of Appeals for the Ninth Circuit expressed its views upon a similar problem with reference to food as follows:

"It is further argued that the court should not destroy 1,600 cases of good salmon because 400 cases of the same lot are found to be adulterated. In answer to this we need only say that destruction does not follow condemnation as a matter of course. Section 10 of the act [21 U.S. C.A. § 14] provides for the restoration of the goods on payment of the costs and the giving of a sufficient bond to the effect that the articles will not be sold or otherwise disposed of contrary to the provision of the act. Under this provision the defendant in error may, and will doubtless be permitted to, separate the good from the bad, and the burden of so doing should rest upon it, and not upon the government or the ultimate consumer. If it cannot do this, it is its own misfortune, and it must suffer the consequences." Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542, 545.

United States v. 200 Cases, etc., D.C.Tex. 1923, 289 F. 157, seems contra to the Andersen case. But it proceeds upon the theory that the shipment cannot be condemned unless every article therein has been shown to be defective. For the reasons noted above in discussing claimant's contention to the same effect, this case seems unsound.

The claimant herein seems especially concerned, however, because it contends that, upon reinspection pursuant to the bonding procedure provided for in 21 U.S. C.A. § 334(d), the articles will be rendered useless, or at least their quality and strength impaired by the wear occasioned by any further testing. But the purposes of the Act cannot be relaxed merely because of difficulties which may be encountered upon reinspection. The claimant's own testimony shows that these articles are inspected at the factory before shipment, and it contends that such methods of testing are the most modern known in this particular trade. No good reason is suggested why the same articles cannot be again subjected to the testing to which they were subjected at the factory before they entered the channels of interstate commerce. In any event, these goods are sent into commerce labeled "Prophylactics." The Act seeks to prevent the sale of articles labeled as prophylactics when in fact they are not. The burden of separating the good from the bad under these circumstances should rest on the claimant. Certainly, if the manufacturer desires to continue the labeling and representations as to the quality and strength of its product, it will have to contend with whatever hardships or inconveniences the violation of the law may entail.

It follows from the foregoing that the Government is entitled to findings of fact and conclusions of law in harmony with the foregoing, as prayed for in its libel of information, with the right of the claimant to proceed under Section 334(d) in accordance with the provisions therein contained.

An exception is allowed to the claimant.