UNITED STATES of America

v.

310 CANS, MORE OR LESS, etc., labeled in part: "MODERN EGG PRODUCTS, Inc., FROZEN WHOLE EGGS, 30 Lbs. Net Weight".

UNITED STATES of America

v.

272 CANS, MORE OR LESS, of an article labeled in part: "204 FROZEN WHOLE EGGS * * * 30 Lbs. Net Wt. * * * 56174 207".

Civ. Nos. 58 C 1230, 58 C 1694.

United States District Court
N. D. Illinois, E. D.
Jan. 28, 1959.
As Amended Feb. 3, 17, 1959.

Robert Tieken, U. S. Atty. for Northern Dist. of Illinois and Richard C. Bleloch, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Frank J. McGarr, of McKay, Solum & McGarr, Chicago, Ill., for claimant.

IGOE, District Judge.

1. On or about May 21, 1958, June 16, 1958, and July 28, 1958, Modern Egg Products, Inc., Nashville, Tennessee, shipped from Tennessee to Chicago, Illinois, consigned to Weinberg Bros. and Co., articles of food consisting re-

spectively of 610, 539, and 272 30-pound cans, more or less, of frozen whole eggs.

2. On July 7, 1958, the United States of America filed a Libel of Information in civil action number 58 C 1230 charging that the articles of food shipped on May 21, 1958, and June 16, 1958, were adulterated within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 342(a) (3), in that they consisted wholly or in part of a decomposed substance by reason of the presence therein of decomposed eggs.

3. On September 12, 1958, the United States of America filed a Libel of Information in civil action number 58 C 1694 charging that the article of food shipped on July 28, 1958, was adulterated within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 U.S. C.A. § 342(a) (3), in that it consisted wholly or in part of a decomposed substance by reason of the presence therein of decomposed eggs.

4. Weinberg Bros. and Co., Chicago, Illinois, filed a claim of ownership and answer in each of the Libel proceedings and denied the allegation of adulteration.

5. The two causes were ordered consolidated and set for trial by the Court, without a jury.

6. It was stipulated that from the date of shipment from Nashville, Tennessee, and up to the present time, all of the cans of eggs have continuously been in hard frozen form and their quality and condition is the same as it was when introduced into interstate commerce.

7. Organoleptic examination by smell was made by inspectors of the Food and Drug Administration of: 74 cans randomly sampled from the shipment of May 21, 1958, and 21 of these gave off the odor of decomposed eggs; 20 cans randomly sampled from the shipment of June 16, 1958, and 9 of these gave off the odor of decomposed eggs; 20 cans randomly sampled from the shipment of July 28, 1958, and 15 of these gave off the odor of decomposed eggs.

8. The cans randomly selected and examined by inspectors of the Food and Drug Administration and physical samples taken therefrom by them for bacteriological and chemical examination by scientists of the Food and Drug Administration were representative of the quality and condition of the shipments of which they were a part.

9. At request of claimant, inspectors of the Department of Agriculture organoleptically examined by smell all of the cans from each of the shipments and determined that 4 cans of the May 21, 1958, shipment; 26 cans of the June 16, 1958, shipment; and 31 cans of the July 28, 1958, shipment smelled unsatisfactory.

10. All of the cans of eggs which smelled decomposed to the Food and Drug inspectors or unsatisfactory to the Department of Agriculture inspectors consisted in whole or in part of decomposed substances.

11. Some decomposed eggs do not have an odor and their presence in a can of frozen eggs cannot be determined by organoleptic examination but can be determined by bacteriological and chemical analyses.

12. The aroma of odoriferous decomposed eggs in a can of frozen whole eggs can be diluted out but the presence of such eggs can be determined by bacteriological and chemical analyses.

13. The physical samples collected by the Food and Drug inspectors were examined by an experienced bacteriologist of the United States Food and Drug Administration who found that the direct microscopic count of bacteria in the samples of the frozen eggs here involved was in the following range:

| | | | | |
|---|---|---|---|---|
| May 21, 1958 Shipment | – | 61,000,000 | – | over 350,000,000 |
| June 16, 1958 Shipment | – | 33,000,000 | – | 78,000,000 |
| July 28, 1958 Shipment | – | 51,000,000 | – | 123,000,000 |

14. Physical samples collected by the Food and Drug inspectors were analyzed by an experienced Food and Drug Administration chemist whose chemical analyses of the samples of the frozen eggs here involved showed the presence of (in milligrams per 100 grams):

|  | May 21 | June 16 | July 28 |
|---|---|---|---|
| acetic acid | 4.4 – 19.3 | 7 – 9.8 | 7.1 – 9.4 |
| lactic acid | 44 – 64 | 35 – 47 | 45.1 – 49.2 |
| formic acid | not tested for | 0 – 4.0 | not tested for |
| succinic acid | not tested for | 0 – 3.9 | not tested for |

15. The shipper of the eggs, Modern Egg Products, Inc., retained a private, independent, professional analyst who randomly sampled cans from each shipment and determined that every can sampled smelled decomposed upon organoleptic examination.

16. The private food analyst retained by the shipper collected physical samples from each of the shipments and utilizing the same methods of analysis as did the Food and Drug Administration chemist found acetic and lactic acids in each of the samples.

17. The bacteriological and chemical methods of analyses for detecting decomposition in frozen eggs which were developed by and used here by the Government scientists and the private food analyst have been published and are accepted by the frozen egg industry as a reliable method for detecting decomposition.

18. All of the scientific evidence in the case, presented by employees of the Food and Drug Administration, employees of the Department of Agriculture, and the private, independent analyst retained by the shipper, shows that each of the shipments of frozen eggs here involved consist in part of decomposed substances by reason of the presence of decomposed eggs.

### Conclusions of Law

1. The articles of food here involved were shipped in interstate commerce from Nashville, Tennessee, to Chicago, Illinois, on the dates alleged in the Libels of Information.

2. The articles were seized in the Northern District of Illinois and the Court has jurisdiction over these consolidated causes and the parties.

3. That each of the shipments of frozen whole egg made by Modern Egg Products, Inc., on May 21, 1958, June 16, 1958, and July 28, 1958, constitutes an article for purposes of 21 U.S.C.A. § 334.

4. Organoleptic tests by use of the sense of smell are determinative of the presence of decomposed substances in frozen eggs, within the meaning of 21 U.S.C.A. § 342(a) (3), when the odor of decomposition is present. Decomposition can exist, however, within the meaning of 21 U.S.C.A. § 342(a) (3) even when no odor is obtained but this decomposition will be detected by bacteriological and chemical analyses.

5. The presence of bacteria in frozen whole egg in an amount in excess of 5,000,000 per gram of egg by direct microscopic count is determinative of the presence of decomposed substances in the eggs within the meaning of 21 U.S.C.A. § 342(a) (3).

6. The presence of acetic, formic or succinic acid in any measurable quantity in frozen whole egg is determinative of the presence of decomposed substances in the eggs within the meaning of 21 U.S.C.A. § 342(a) (3).

7. The presence of lactic acid in excess of 7 milligrams per 100 grams of egg in combination with a direct microscopic bacteria count of 5,000,000 or more is determinative of the presence of

decomposed substances in frozen eggs within the meaning of 21 U.S.C.A. § 342 (a) (3).

■ 8. By reason of the presence therein of decomposed eggs, a part of each of the articles here involved was adulterated when introduced into and while in interstate commerce within the meaning of 21 U.S.C.A. §§ 334(a) and 342(a) (3).

9. If a part of an article of food is adulterated within the meaning of 21 U.S.C.A. § 342, the entire article must be condemned.

10. The said articles of food seized herein are subject to forfeiture and condemnation to the United States.

11. The Government is entitled to a decree of condemnation and forfeiture, pursuant to 21 U.S.C.A. § 334(a), and to its costs pursuant to 21 U.S.C.A. § 334 (e).

### Decree of Condemnation

On July 7, 1958, and September 12, 1958, libels of information against the above-described articles were filed in this Court on behalf of the United States of America by the United States Attorney and the Assistant United States Attorney for this district. The libels allege that the articles proceeded against are foods which were shipped in interstate commerce and are adulterated in violation of the Federal Food, Drug, and Cosmetic Act. 21 U.S.C.A. § 342(a) (3). Pursuant to Monition issued by this Court, the United States Marshal for this district seized said articles on July 19, 1958, and on September 15, 1958. Thereafter Weinberg Bros. & Co., of Chicago, Illinois, intervened and filed claim to said articles and on motion of the claimant the causes were ordered consolidated for trial.

The causes having come on for hearing before this Court without a jury and the Court having found that the said articles were adulterated when introduced into and while in interstate commerce in violation of 21 U.S.C.A. § 342 (a) (3), and having filed Findings of Fact and Conclusions of Law, it is

Ordered, Adjudged, and Decreed that the said articles under seizure are condemned pursuant to 21 U.S.C.A. § 334 (a) ; and it is further

Ordered, Adjudged, and Decreed, pursuant to 21 U.S.C.A. § 334(e) that the United States of America shall recover from said claimant Court costs, fees, storage and other proper expenses to date as taxed herein; and also such further costs as may be incident to this proceeding; and it is further

Ordered, Adjudged, and Decreed that if claimant, within 20 days after the filing of this Decree, (a) pays in full the aforementioned Court costs and fees, and storage and other proper expenses of the proceeding herein, and (b) executes and files with the Clerk of this Court a good and sufficient penal bond with surety in the sum of $19,000, approved by this Court, payable to the United States of America, and conditioned on the claimant's abiding by and performing all the terms and conditions of this Decree and of such further Orders and Decrees as may be entered in this proceeding, that the United States Marshal for this district shall release said articles from his custody to the custody of claimant for the purpose of denaturing all of the cans in each of said articles so as to preclude their use for human food purposes and to permit their use only as animal feed or for industrial purposes; and it is further

Ordered, Adjudged, and Decreed that

1. After the filing of the bond in this Court the claimant shall give written notice to the Food and Drug Administration, Department of Health, Education, and Welfare, Chicago, Illinois, of the location were the aforesaid work and operations are to be performed, and shall comply with the directions given by the inspector in charge of the shipment.

2. The claimant shall at all times, until the articles have been released by a duly authorized representative of the Department of Health, Education, and Welfare, retain intact the entire lot of

goods comprising the articles for examination or inspection by said representative, and shall maintain the records or other proof necessary to establish the identity of said lot to the satisfaction of said representative.

3. The claimant shall not commence the aforesaid work and operations until it has received authorization to do so from a duly authorized representative of the Department of Health, Education, and Welfare.

4. The claimant shall at no time, and under no circumstances whatsoever, ship, sell, offer for sale, or otherwise dispose of any part of said articles until a duly authorized representative of the Department of Health, Education, and Welfare shall have had free access thereto in order to take any samples or make any tests or examinations that are deemed necessary, and shall in writing have released such articles for shipment, sale or other disposition.

5. Within 90 days from the date of the filing of the Decree in this Court, claimant shall complete the aforesaid work and operations under the supervision of a duly authorized representative of the Department of Health, Education, and Welfare.

6. The claimant shall abide by the decisions of said duly authorized representative of the Department of Health, Education, and Welfare, which decisions shall be final. If claimant breaches any conditions stated in this Decree, or in any subsequent Decree or Order of the Court in this proceeding, claimant shall return the articles immediately to the United States Marshal for this District at claimant's expense, or shall otherwise dispose of it pursuant to an Order of this Court.

7. The claimant shall not sell or dispose of said articles or any part thereof in a manner contrary to the provisions of the Federal Food, Drug, and Cosmetic Act, or the laws of any State or territory (as defined in said Act) in which it is sold or disposed of.

8. The claimant shall compensate the United States of America for costs of supervision at the rate of $32 per day per representative for each day actually employed in the supervision of the aforesaid work and operations, as salary or wage; where laboratory work is necessary, at the rate of $40 per day per person for such laboratory work; where subsistence expenses are incurred, at the rate of $12 per day per person for such subsistence expenses. Claimant shall also compensate the United States of America for necessary traveling expenses and for any other necessary expenses which may be incurred in connection with the supervisory responsibilities of said Department of Health, Education, and Welfare.

9. If requested by a duly authorized representative of the Department of Health, Education, and Welfare, claimant shall furnish to said representative duplicate copies of invoices of sale of the released articles, or shall furnish such other evidence of disposition as said representative may request.

The United States Attorney for this District, on being advised by a duly authorized representative of the Department of Health, Education, and Welfare that the conditions of this Decree have been performed, shall transmit such information to the Clerk of this Court, whereupon the bond given in this proceeding shall be cancelled and discharged; and it is further

Ordered, Adjudged, and Decreed that if the claimant does not avail itself of the opportunity to repossess the condemned articles in the manner aforesaid, the United States Marshal for this District shall at the expiration of 20 days from the filing of this Decree secure the destruction of the articles; and it is further

Ordered, Adjudged, and Decreed that this Court expressly retains jurisdiction to issue such further Decrees and Orders as may be necessary to the proper disposition of this proceeding, and that should the claimant fail to abide by and perform all the terms and conditions of this Decree, or of such further Order or Decree as may be entered in this pro-

ceeding, or of said bond, then said bond shall on motion of the United States of American in this proceeding be forfeited and judgment entered thereon.