339 F.Supp. 131 (1972)
UNITED STATES of America
v.
An article of food consisting of: 1,200 CANS, article Labeled in part (can) "30 lbs. Net Weight, PASTEURIZED WHOLE EGGS, distributed by FRIGID FOOD PRODUCTS, INC.DETROIT, MICH." (coded 1937)
UNITED STATES of America
v.
Articles of food consisting of: 1,250 CANS, MORE OR LESS, Labeled in part "LOT NO. 1949" (STORED UNDER LOT NO. 2149), et al.
UNITED STATES of America
v.
Approximately 26 CANS, article Labeled in part (can) "SUGAR YOLKS  Net Weight 30# Lot No. 2923 Packed by GOLDEN EGG PRODUCTS, INC., ONEONTA, ALABAMA, Ala. #14204"  Stored under Lot No. 2923, et al.
UNITED STATES of America
v.
Articles of food consisting of: 1,250 CANS, MORE OR LESS, of an article Labeled in part: (can) "PASTEURIZED FROZEN WHOLE EGGS * * * Net Wt. 30 lbs. Lot No. 1002 Distributed by SUN CITY DAIRY PRODUCTS, INC., MIAMI, FLORIDA"
or
"Frozen Pasteurized Whole Eggs 30 lbs. Net Distributed by Sun City Dairy Products, Inc. * * * Hialeah, Florida", et al.
UNITED STATES of America
v.
Articles of food consisting of: 514 CANS, MORE OR LESS, and 15 cans, more or less (both lots CODED "1976"), et al.
Civ. A. Nos. 14782-14784, 14796 and 14821.
United States District Court, N. D. Georgia, Atlanta Division.
March 8, 1972.
*132 *133 *134 Ralph B. Guy, Jr., Richard L. Delonis, Detroit, Mich., John W. Stokes, Jr., U. S. Atty., Beverly B. Bates, Asst. U. S. Atty., Atlanta, Ga., for plaintiff.
Lewis R. Baron, Robert M. Newton, Chicago, Ill., Miles J. Alexander, George B. Haley, Jr., Atlanta, Ga., for defendants.
SIDNEY O. SMITH, Jr., Chief Judge.
These five actions were brought in different parts of the United States pursuant to Section 304 of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 334) to condemn and destroy as adulterated various lots of pasteurized frozen whole eggs and sugar yolks processed and introduced into interstate commerce by the Golden Egg Products, Inc. of Oneonta, Alabama ("Golden Egg"). Proceeding under the statute, the government contends that the lots were "adulterated" in one or more of the definitions prescribed by Congress in 21 U.S.C. § 342, which provides in part:
"A food shall be deemed to be adulterated 
(a) (1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health; ...
* * * * * *
(3) If it consists in whole or in part of any filthy, putrid, or decomposed substance, or ...
(4) If it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; ..."
In each instance, the purchaser from Golden Egg, Bender Goodman, Inc., has filed appropriate claims denying that the eggs are adulterated and seeking an order returning the property to them for sale in commerce. The actions were all transferred to this district and consolidated for trial before the court. On the basis of the facts and law, the court makes the following findings:[1]

BACKGROUND.
Golden Egg is a so-called frozen egg breaking plant, the purpose of which is to remove eggs from their shells, process the egg magma, and package and freeze it in a variety of combinations for sale to manufacturers. Its principal use is in the baking, dairy products and vegetable oil industries. Almost all is used for food or as components of other foods and is therefore subject to regulation in interstate commerce under the Act. 21 U.S.C. § 321(f). United States v. O. F. Bayer & Co., 188 F.2d 555 (2d Cir. 1951); Otis McAllister & Co. v. United States, 194 F.2d 386 (5th Cir. 1952).
Of comparative recent development are mechanical egg-breaking plants, but more typical of the industry in the past, and present here, is a hand breaking operation. *135 In the ideal process, wholesome clean cool eggs are broken by workers in antiseptic conditions, collected in buckets, strained, pasteurized, and sealed in sterile containers, quick-frozen and stored at low temperatures until used. Customary in the trade are 35 gallon cans, sold in lots. Because of economic considerations, most plants must resort to the purchase of eggs of less than Grade A standard table eggs, which come in a variety of forms, grades and prices.[2] In many instances, they have neither been inspected, cleaned or classified in any way, but are acquired in their natural state as "farm runs" in packing cases, or egg pullmans, furnished by the seller. Whatever their state, it is important that they be held at moderate temperatures not in excess of 40° or 45° to prevent the growth of harmful organisms prior to processing and carefully segregated and cleaned prior to use.
In a significant forward step, all such egg and dairy products have been required to be pasteurized since 1966 and this has greatly reduced the possibility of toxic ingredients reaching the consumer. 21 CFR 42.10 ff. However, because of the nature and source of the egg stock commonly used, it is most important that all steps in the process be conducted with care so as to avoid the possibility of harmful adulteration. The major functions in an egg-breaking plant may be broken down to: inspection, rejection, and cleaning; breaking; pasteurization; and packaging. These are normally performed in separate rooms or locations known as the transfer room, breaking room, pasteurization room, and filling room. The nature of the product and each function  particularly the first two  affords ample opportunity for the contamination prohibited by law.
By way of enforcement, Food and Drug inspectors have ministered the Act under the investigative powers afforded in 21 U.S.C. §§ 372 and 374. This has resulted in spot-checking of plants at one end and of shipped production at the other end. Effective June 29, 1972, enforcement will be transferred to the Department of Agriculture with a continuous in-plant inspection service similar to that previously employed in the meat and poultry dressing plants. 21 U.S.C. § 1031 ff. Undoubtedly, the latter will form a more efficient supervision albeit at increased public cost. Nonetheless, at present, condemnation is judged on the basis of evidence sporadically, though systematically, gathered by periodic inspection and testing. A difficulty lies in the obvious  namely, that the present method only gives a partial insight into a particular plant's total production in terms of time and quantity, while the new method should afford total coverage.
While the Federal Food, Drug, and Cosmetic Act contains criminal sanctions, the authorities are in general agreement that it should be liberally construed so as to protect the public health. United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943); United States v. Kordel, 146 F.2d 913 (7th Cir. 1947), aff'd 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948), reh. den. 335 U.S. 900, 69 S.Ct. 298, 93 L.Ed. 435 (1948), reh. den. 336 U.S. 911, 69 S.Ct. 513, 93 L.Ed. 1075 (1949). E. g. United States v. Bodine Produce Co., 206 F. Supp. 201 (D.Ariz.1962). To that end it has early and consistently been held that no actual injury to the public health need be shown or even that it "must" necessarily result, but only that it "may possibly injure the health" of a consumer. United States v. Lexington Mill and Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914). Accordingly, when a statute is worded in the subjunctive, the test is whether the result is reasonably possible; when the statute is worded in the absolute, then the test is one of certainty.

*136 I. Poisonous substances under 21 U.S.C. § 342(a) (1).

"A food shall be deemed to be adulterated if it bears or contains any poisonous or deleterious substance which may render it injurious to health."
Only one lot involved here (Can Code 1941) is claimed to be adulterated under this section. It was part of a seizure in Boston in August, 1970, and was produced by Golden Egg on July 1 and July 2. Twenty drillings were taken of this lot, packaged, and packed in dry ice for transportation to government laboratories. In the course of the microbiological examination conducted in accordance with testing standards of the Association of Official Agricultural Chemists (AOAC), in Boston, one subsample was found to have Salmonella contamination. It was forwarded to Washington for confirmation as to species. On or about August 31st, the government Salmonella expert completed the cultures and isolated the bacteria as Salmonella Worthington.
Salmonella itself is a well-recognized pathogen. There are some 1400 types, all felt by medical scientists to be deleterious. As such, Salmonella constitutes a serious threat to public health, particularly to the old, the young, and the sickly. Salmonella Worthington is particularly found in fowl and can be cultured from a carcass or from the feces of an infected chicken. An infected chicken generally contaminates an egg with this Salmonella on the outside only. However, one of the greatest benefits of the pasteurization process is that it normally destroys all Salmonella getting into the product, but improper processing or recontamination is possible.
The presence of Salmonella in frozen eggs is a deleterious and poisonous additive which is dangerous to health within the meaning of 21 U.S.C. § 342(a) (1). Such fact is stipulated here. See United States v. Scars of Louisiana, Inc., 324 F.Supp. 307 (E.D.La.1971). Accordingly, Lot 1941 is subject to condemnation under this section.[3]

II. Decomposed Substances under 21 U.S.C. § 342(a) (3).

"A food shall be deemed to be adulterated if it consists in whole or in part of any filthy, putrid, or decomposed substance."
At the outset, it should be noted that this particular section is worded in the absolute. Thus, the question presented is not whether a particular lot "may" be filthy, putrid, or decomposed, but whether it actually is. Nonetheless, in arriving at a proper standard, the courts readily agree that such conditions are not necessarily related to the food's fitness or unfitness for human consumption. Thus, a food substance may be condemned under the present statute as decomposed, filthy, or putrid even though it is not unfit for food. E. g. United States v. 484 Bags, More or Less, 423 F.2d 839 (5th Cir. 1969); United States v. 1851 Cartons, etc., 146 F.2d 760 (10th Cir. 1945); United States v. 599 Cases, More or Less, 204 F.Supp. 104 (E.D.Pa.1962). The removal of this requirement has in fact, rendered the legal inquiry more difficult. Experts and layman are more likely to agree upon a common meaning of "fitness for food", than upon the meaning of the words "filthy, putrid or decomposed" in a literary vacuum. It was early and often stated that the words should have their plain, ordinary common meaning. E. g. United States v. Swift & Co., 53 F.Supp. 1018 (M.D.Ga.1943); United States v. Cassaro, Inc., 443 F.2d 153 (1st Cir. 1971). In any event, under the absolute *137 language of the statute, there must exist actual filth, putridity, or decomposition. As to the last, which is the issue here,[4] the Act means more than the beginning of decomposition, it means a state of decomposition. A. O. Andersen & Co. v. United States, 284 F. 542 (9th Cir. 1922). And, in this respect, the courts endeavor to employ "a reasonable interpretation to carry out legislative policy or intent." United States v. 184 Barrels Dried Whole Eggs, 53 F.Supp. 652 (E.D.Wis.1943); United States v. 1851 Cartons, 55 F. Supp. 343 (D.Colo.1944). In this connection, the courts recognize that Section (a) (3) sets a standard that if literally enforced would ban virtually all processed food from interstate commerce in that a scientist with a microscope could find filthy, putrid, and decomposed substances in almost any food we eat.[5] To afford a practical application of the law, the Secretary has been granted the discretion under § 341 to adopt administrative working tolerances, within which no prosecutions occur, and the courts may accept them as a proper judicial measure of compliance. United States v. 484 Bags, More or Less, 423 F.2d 839 (5th Cir. 1970); United States v. 1,500 Cases More or Less, 236 F.2d 208 (7th Cir. 1956). However, the Secretary has not seen fit to do so with egg products. 21 CFR 42.1. Thus, in this instance, the facts must be judged in the absence of the workable standard of fitness for food, (removed by the courts) or a measurable tolerance (omitted by the Secretary.)
Without these tools, the task is not easy. What, then, is decomposition and how do you measure it? Other courts have apparently grappled with the riddle without definitive success. United States v. 449 Cases, etc., 212 F.2d 567 (2d Cir. 1954); United States v. 1,500 Cases More or Less, 236 F.2d 208 (7th Cir. 1956).
As to definition, the court sought an acceptable consensus throughout the trial. Even when pressed, however, the experts on this issue had no ready answer. Interestingly enough, they all attached Sections (a) (1) and (a) (4) considerations to the question, strongly relying on the possibility of injury to health.[6] The court sees no practical distinction between "injurious to health" and "unfit for food" and, in the context here, these considerations are minimal if relevant at all. However, all agree that decomposition involves a bacterial separation or breakdown in the elements of the food so as to produce an undesirable disintegration or rot. That in itself is close to the dictionary definition and will have to suffice. Perhaps the term is similar to drunkenness  it is easy to detect, but hard to define.

The Organoleptic Evidence.
Indicative of this attribute is the almost universal acceptance of organoleptic tests for determining decomposition. All of the experts in this case agree that, honestly administered they are valid. To some extent, all of us have God-given organoleptic expertise. We exercise the powers of sight, smell, taste and feel to reject unpalatable food. As used in food and drug matters, the organoleptic test is a mere refinement in that people can be trained to detect why the food is offensive, i. e. due to rot, mold, sours, etc. The Government periodically conducts *138 schools for training its inspectors in such procedures, but in the final result, the organoleptic examination is not far removed from that daily performed by the housewife. If the food smells bad, she rejects it. And yet, it is generally approved by the most exacting of scientists as proper. More importantly, in civil cases,[7] it has been recognized by the courts for at least 50 years. United States v. 443 Cans of Frogen Egg Product, 193 F. 589 (3rd Cir. 1912); Knapp v. Callaway, 52 F.2d 476 (S.D.N.Y.1931); United States v. 284 Barrels of Dried Eggs, 52 F.Supp. 661 (W.D.Tenn.1943); United States v. 1851 Cartons, etc., 55 F.Supp. 343 (D.Colo.1944); United States v. 310 Cans, More or Less, etc., 170 F.Supp. 16 (N.D.Ill.1959); United States v. Ocean Perch Fillets, 196 F. Supp. 255 (D.Maine 1961). Organoleptic smell tests have worked extremely well on unpasteurized egg products for years. The product is either "passable" or "rejected."[8] However, the pasteurization process, which basically arrests decomposition, has posed a new problem.
The pasteurization process universal since 1966, plus refinements in the freezing process have masked decomposition odors and made the test much more difficult. In the drilling process for microbiological samples, an examiner uses an electric drill, and a sanitized bit (normally ¼") and bores into the frozen product to the bottom of the can. As it is extracted, the shavings are collected in a pre-sterilized spoon and placed into a sterile whirl-pack bag or jar. Then it is rushed in dry ice to cold-storage facilities for later laboratory examination. The heat generated by the bit gives a brief opportunity for organoleptic testing during the drilling process. As thawing or heating regenerates the decomposition process, the use of organoleptic examination from the sample bags at a later date is effective only under exacting conditions. Usually, one can get only one smell upon opening the bag. Thus, it is extremely difficult to effect a satisfactory organoleptic test on lots of pasteurized frozen eggs. Conversely, however, the presence of a test failure under these conditions would be strong evidence of decomposition.
In this case, only two lots (Can Codes 1935 and 1937) were subjected to and failed such tests. In most lots, two subsamples for laboratory use were taken from ten random cans for a total of 20 subsamples in each lot. Lot 1935 had two such series taken (084-822D and 084-823D). In them, a competent organoleptic examiner found two clear rejects in each series. Out of ten subsamples in Lot 1937, another competent examiner found two passable, five rejects, and three possibles, or borderlines.
Recognizing the validity of the tests and the accuracy of the results, the court is concerned only with the quantum of the proof. Little attention was given this question by the parties on trial and the court cannot ascertain with accuracy the total number of cans in each lot, but apparently they average some 1250 or more. Nor is there much authority on the question of quantity. What, if any, percent of the total lot must be shown to be decomposed to condemn the entire lot? In fish cases, 5% has been rejected as insufficient [United States v. 1851 Cartons, 55 F.Supp. 343 (D.Colo.1944)] and 6% has been accepted as adequate [United States v. Ocean Perch Fillets, 196 F.Supp. 255 (D.Maine 1961)]. This is a fine line. Perhaps the soundest approach is an early one: " there is no room for controversy over percentages under the statute itself, for it excludes *139 all. Of course, where the entire product is not inspected or tested, the proof must go far enough to satisfy the court or jury that the adulteration extends to the whole product sought to be condemned." A. O. Andersen & Co. v. United States, 284 F. 542 at 545 (9th Cir. 1922). Twenty percent was considered sufficient there. Far less  as few as four cans from one shipment  was acceptable in one egg case. United States v. 310 Cans, More or Less, 170 F.Supp. 16 (N. D.Ill.1959). Recognizing that the trend is to order condemnation if the lot is decomposed "to any degree",[9] the court is still not satisfied that the organoleptic evidence is sufficient to conclude that the entire lots in question are decomposed. Such conclusion is simply not established by a preponderance of the evidence.
This is not to say that the organoleptic test is no longer viable. To the contrary, a consistent showing of organoleptic failure in a reasonable quantity would subject these or any other lots to forfeiture.[10]

The Microscopic Evidence.
Because of these difficulties and the fact that not all decomposition is discoverable under organoleptic tests, interested parties have for years sought a more scientific method for establishing and measuring decomposition. See United States v. Commercial Creamery Co., 43 F.Supp. 714 (E.D.Wash.1942). Much careful research has gone into the problem on the universal premise that, except in rare instances, decomposition is caused by bacterial activity. Thus, if an accurate way of measuring this activity or its effects can be found, the problem will be greatly simplified for the government and processors alike. Typical of this approach is the Howard Mold count in tomato paste matters.[11]
The acid tests have long been approved by the courts. E. g. Knapp v. Calloway, 52 F.2d 476 (S.D.N.Y.1931); United States v. 284 Barrels of Dried Eggs, 52 F.Supp. 661 (W.D.Tenn.1943). According to the testimony, they have been run in most other egg cases, but not here. Admittedly, they measure the activity of micro-organisms by ascertaining the presence of formic, acetic, or succinic acid which are their by-products. Moreover, exact standard tests and methods are available. Instead, the government here relies on evidence of Direct Microscopic Count (DMC) alone.
There can be little dispute that the presence of large numbers of bacteria in a product indicates a greater possibility of activity than a small number. Accordingly, the DMC tests proceed on the basis of ascertaining the actual count in any given product by random sampling. Under acceptable AOAC methods, a precise amount of the product is spread on a slide over a given area, stained, and placed under a high-powered microscope. Then, one field of view is examined and the bacteria, both dead and alive, are counted. By applying the mathematical factors in the relationship of the field to the sample and the power of the microscope, the total count per gram can be projected. If the count is 3,000,000 or less, then 30 fields are counted; if more, then 20 fields are counted to obtain a representative result. Years of testing has indicated that DMC counts of 5,000,000 or more coupled with the presence of certain acid measurements are proof of decomposition in unpasteurized eggs. This is the previous written conclusion of its principal proponent, Dr. A. P. Dunnigan, *140 the FDA microbiologist and a leading expert in the field. The combination of the 5,000,000 count plus positive acid tests is legally acceptable to defendant's experts and, at least, to one court. United States v. 310 Cans, More or Less, 170 F.Supp. 16 (N.D.Ill.1959).
Here, however, the government seeks to establish the reliability of a DMC count alone. The evidence presented at trial convinces the court that this standard is not acceptable.
Firstly, the DMC count if scientifically accurate only measures the presence of both live and dead bacteria and not their activity (as do the acid tests). Inasmuch as chemical breakdown is the proof positive of decomposition, it cannot be ascertained from a DMC alone whether those bacteria present have or are actively producing the breakdown. Thus the total numbers of bacteria by themselves, while useful for other purposes[12] or in conjunction with acid tests, are not exclusively significant in determining the presence of actual decomposition. Moreover, by reason of the irregular distribution of bacteria throughout frozen eggs and the inherent difficulty in counting those actually observed through the microscope, the DMC is subject to significant variances in different tests run on the same sample. Assuming arguendo that a certain count by the DMC method is acceptable evidence of decomposition, these variances cast considerable doubt on many of the tests performed here. The reported counts by the DMC method on all lots are shown as Appendix A to these findings. The variances in Lots Numbers 1976, 1937, 1010, 1940, 1941, 1942, 1947 and 1949 are indicative of the problem. Even the government witnesses were reluctant to conclude that certain of the lots were decomposed, particularly where the variance exceeded "plus or minus 50%." Thus on the unconvincing original premise that a DMC result may prove actual decomposition under Section (a) (3) and on the substantial test variances on the lots in question, the court concludes that the government's case on this basis fails.[13]
Accordingly, with the exception of the few cans designated, none of the lots is subject to condemnation under this section.

III. Insanitary Conditions under 21 U.S.C. § 342(a) (4).

"A food shall be deemed to be adulterated if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."
While there are many similarities between (a) (3) and (a) (4) proceedings, the legislative thrust of the latter is entirely different. In essence, the (a) (3) section permits the seizure of foods which have actually decomposed irrespective of processing conditions; even if they were completely sanitary. On the other hand, the (a) (4) section allows the condemnation of foods processed under insanitary conditions, whether they have actually decomposed or become dangerous to health or not. The objective of (a) (4) is to "require the observance of a reasonably decent standard of cleanliness in handling of food products" and to insure "the observance of those precautions which consciousness of the obligation imposed upon producers of perishable food products should require *141 in the preparation of food for consumption by human beings." Hearings Before the Senate Committee on Commerce, S. 2800, 73rd Cong., 2d Sess., Mar. 3, 1934. It almost reaches the aim of removing from commerce those products produced under circumstances which would offend a consumer's basic sense of sanitation and which would cause him to refuse them had he been aware of the conditions under which they were prepared.
To that end, although the ultimate product may not be filthy or injurious to health, if it was processed under insanitary conditions whereby it "may" have been contaminated with filth or whereby it "may" have been rendered injurious to health, it is adulterated within the meaning of Section (a) (4). United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed. 2d 536 (1964); United States v. International Exterminator Corp., 294 F.2d 270 (5th Cir. 1961); Berger v. United States, 200 F.2d 818 (8th Cir. 1952); United States v. Lazere, 56 F.Supp. 730 (N.D.Iowa 1944).
Again, it would be helpful if there were specific plant standards or tolerances to guide the court. The need has been expressed before. United States v. 1,500 Cans More or Less, etc., 236 F.2d 208 at 212 (7th Cir. 1956). Some argument has been made that the regulations promulgated in 1969 answer this purpose. 21 CFR 128.1-128.9. With a few exceptions, they are inadequate to do so in that they fail to specify just what is "necessary", "needed", "effective", "sufficient", or the like. In the context of actual conditions in a particular industry, the regulations simply require an absolute standard, which well might be impossible to achieve. It is true that impossibility technically furnishes no defense. United States v. Hammond Milling Co., 413 F.2d 608(4) (5th Cir. 1969). Certainly it is no defense that a processor is "doing the best he can under the conditions and circumstances." United States v. Lazere, 56 F.Supp. 730 (N.D. Iowa 1944). However, even without a specific measuring stick, the law must always be construed to be real and meaningful to the every day life of the citizenry. It has been done in (a) (4) cases. Thus, the ultimate test is whether the conditions are such that it is "reasonably possible" the food may become contaminated with filth or may be rendered injurious to health. United States v. Hammond Milling Co., 413 F.2d 608 (5th Cir. 1969); United States v. International Exterminator Corp., 294 F.2d 270 (5th Cir. 1961); United States v. Cassaro, 443 F.2d 153 (1st Cir. 1971).
In the absence of particular standards, the question must be determined from the totality of the circumstances as revealed by the evidence. See United States v. 1,500 Cases More or Less, etc., 236 F.2d 208(2) (7th Cir. 1956). In this regard, it is not necessary that the evidence of insanitary conditions absolutely coincide with the dates of processing provided they are not too remote in time or space. E. g. Berger v. United States, 200 F.2d 818 (8th Cir. 1952); United States v. 44 Cases, etc., 101 F.Supp. 658 (E.D.Ill.1951). The proof should, however, justify the inference that such conditions actually existed on the dates in question.
Measured by the above, the test has been met in this case. Reviewing the evidence as a whole, the court must conclude that the conditions existing at the Golden Egg plant on the critical dates were exactly those the Congress sought to prevent by the passage of (a) (4). Attached as Appendix B is a chart showing the time range covered by the testimony at trial as related to the dates of processing. While some extreme dates such as the 1969 inspections some 6-12 months before processing ought to be eliminated, the evidence during 1970 compels the finding of insanitary conditions. This evidentiary history reveals a consistent unsuccessful effort by the Food and Drug Administration enforcement officials over a long period of time to eliminate an intolerable situation at this plant. Even with the aid of a District Court injunction on the government's *142 side and the prodding of knowledgeable counsel and hired sanitation engineers on the processor's side, very little improvement was shown over the first six months of 1970. There is no reason to believe that suddenly in mid-summer, when by reason of climate the problem became more acute, there was any miraculous change. In fact, expert testimony indicates it would be almost impossible to correct such practices in anything short of several months of training. At most, the testimony of the claimant's expert shows some gradual improvement in techniques and control, but the basic problems were never satisfactorily attacked.
These problems lay primarily in a persistent use of inferior egg stock and very poor sanitizing procedures in the Transfer Room and Breaking Room. On the evidence presented the court cannot say that the pasteurizing and packing departments were unsanitary. However, the damage was already done by the time the product reached that point in the process. Good practice only admits the entry into the breaking room of washed clean sanitized eggs, either unmarked or "checks" (which are eggs with cracks, but the underlying protective membrane is unbroken). If proper procedures are utilized, a "crack" (wherein the membrane is broken) which occurs during washing and handling at the plant may also be processed. All other stock should be eliminated. In the breaking operation, extreme care must be exercised to eliminate unsuitable eggs by individual organoleptic examination, to prevent foreign matter from entering the stock, and to practice a continuing resanitizing procedure upon any contamination. Neither in stock, nor equipment, nor personal practices were these requirements met.
To the contrary, in varying degrees the following conditions existed at the times in question: improper refrigeration in the transportation and storage of breaking stock; the use of fiber filler flats in the breaking room; no segregation of breaking stock prior to presenting it to the breaker for breaking; the regular failure to wash, sanitize, and candle the breaking stock before it was sent to the breaking room; the regular breaking of unsanitized and unwashed eggs; the breaking of leaking eggs and eggs with maggots, adhering fecal, and other foreign matter on the shells; ineffective instruction with regard to personal and equipment sanitation; breakers with uncovered open sores breaking eggs; the breaking of eggs without even a sniff to detect rotten eggs; instances where breakers failed to sanitize their hands after handling insanitary objects while breaking eggs; failure to reject rotten eggs; improperly maintained breaking trays that did not permit the breaker to properly observe broken eggs before they dropped into the collecting buckets; paper and rusty parts used on the breaking tray that consistently came into contact with the liquid egg magma; dirty shells in the breaking room strainer; flies, in varying numbers, in the breaking and transfer rooms; evidence of mice in the plant; and improper cleanup and maintenance.
That such conditions still existed on the dates of production is amply borne out by the evidence obtained in the July 24, 1970, FDA inspection, the July 15, 1970, National Sanitation Institute inspection, and the testimony of plant employees presented by both sides at trial. Nor could the potential hazards be corrected by straining, clarifying, and pasteurizing. Much of the material became soluble during the process and it is doubtful if any procedure could eliminate such components from a liquified end product. See 338 Cartons, etc. v. United States, 165 F.2d 728 at 731 (4th Cir. 1947).
The situation is similar to the use of sterile instruments in a dirty hospital operating room. The accompanying dangers are not foreclosed by the last careful act. As indicated, this section is primarily aimed at the accompanying conditions and not the resultant production.
That such practices are those demonstrating a reasonable possibility of the *143 food becoming contaminated with filth or becoming injurious to health is beyond question. The law and expert testimony in this case is clear to the effect that such conditions promote the presence of filth and the growth of harmful bacteria in the product.
Moreover and perhaps most importantly, the DMC evidence in the case is convincing on the question of insanitary conditions and resulting filth. While there is considerable doubt in the court's mind about the valid use of manufacturing conditions to establish decomposition under (a) (3) by the DMC method as advocated by the government, the reverse is assuredly true. The claimant's own experts agree that a high DMC count is scientific proof of the exposure of the product to filth and of production under insanitary conditions. It appears to be established that counts of 5,000,000 per gram or 10,000,000 per gram or higher in unpasteurized eggs is indicative of such facts. In this connection, government researchers have done considerable work to prove that pasteurization removes some 90% of all bacteria. Consequently, it is reasoned that a DMC after pasteurization indicates a DMC ten times greater before the process. While the court believes this research to be a possible breakthrough in the control of pasteurized processed foods, it cannot be said that it has yet reached the level of scientific acceptance to become a legal standard. So far it has not been officially recognized by the FDA or the AOAC or any impartial standards group. Nonetheless, its acceptance by the court is not critical to the evidence here. An examination of Appendix A reveals a substantial number of DMC results in these lots far beyond 5,000,000 per gram even after pasteurization. As stated, the application of such scientific evidence to the oral, written, and visual evidence of conditions at the plant is convincing on the question. All together, the evidence amply authorizes the inference of insanitary production conditions to a degree prohibited by the Act.
Accordingly, the court finds that all lots are subject to condemnation under Section (a) (4).
Government counsel may prepare and present an appropriate decree to the court and opposing counsel.
It is so ordered.

APPENDIX A

 RESULTS OF DIRECT MICROSCOPIC COUNTS
 ON LOTS OF SEIZED EGGS
SAMPLE CAN COLLECTING
NUMBER CODE INSPECTOR ANALYST DMC
084-823 D 1935 Chambers Debo 7,200,000
 2,100,000
 3,600,000
 3,400,000
 3,500,000
 5,200,000
 16,000,000
 14,000,000
 9,900,000
 15,000,000
 LeBlanc 7,000,000
 20,000,000
 26,000,000
 18,000,000
 4,700,000

*144
SAMPLE CAN COLLECTING
NUMBER CODE INSPECTOR ANALYST DMC
084-824 D 2917 Chambers Debo 13,000,000
 10,000,000
 14,000,000
 12,000,000
 19,000,000
 16,000,000
 8,800,000
 19,000,000
 10,000,000
 14,000,000
 LeBlanc 13,000,000
 7,300,000
 11,000,000
 12,000,000
 9,900,000
006-299 D 1976 Scarbrough Longbine 1,200,000,000
 1,200,000,000
 280,000,000
 570,000,000
 850,000,000
 1,900,000,000
 450,000,000
 370,000,000
 360,000,000
 420,000,000
 LeBlanc 9,200,000
 3,800,000
 5,400,000
 2,500,000
 9,400,000
 Gross LeBlanc 5,800,000
 5,200,000
 3,400,000
 3,200,000
 5,300,000
 6,400,000
 3,700,000
 4,400,000
 12,000,000
 6,800,000
 Debo 2,800,000
 8,700,000
005-293 D 1002 Sears Debo 5,500,000
 3,600,000
 650,000
 5,900,000
 11,000,000
 13,000,000
 1,000,000

*145
SAMPLE CAN COLLECTING
NUMBER CODE INSPECTOR ANALYST DMC READINGS
005-293 D 1002 Sears Debo 9,400,000
 6,500,000
 5,200,000
 Longbine 910,000
 16,000,000
042-332 D 1937 Kucharski Tucker 360,000,000 42,000,000
 1,200,000,000 47,000,000
 360,000,000 45,000,000
 360,000,000 57,000,000
 120,000,000 49,000,000
 Smith 22,600,000 17,000,000
 19,700,000 19,000,000
 24,000,000 15,000,000
 23,200,000 15,000,000
 26,800,000 16,000,000
014-290 D 1949 Arzylowicz Kuester 12,000,000 5,500,000
 14,000,000 6,400,000
 Zapatka 2,800,000 2,000,000
 1,900,000 3,600,000
 3,400,000 4,000,000
 2,300,000 2,500,000
 4,900,000 5,700,000
 6,000,000 5,600,000
 3,800,000 6,100,000
 3,200,000 5,500,000
 2,800,000 4,000,000
 5,200,000 6,200,000
 Dunnigan 2,700,000
 3,100,000
 2,300,000
 5,600,000
 4,800,000
 5,600,000
 4,000,000
 5,300,000
 2,700,000
 5,700,000
014-291 D 1942 Arzylowicz Kuester 14,000,000 5,700,000
 19,000,000 9,600,000
 Zapatka 2,200,000 3,100,000
 4,400,000 6,000,000
 3,100,000 4,000,000
 2,000,000 1,200,000
 2,800,000 3,100,000
 1,300,000
 2,400,000
 960,000
 2,000,000

*146
SAMPLE CAN COLLECTING
NUMBER CODE INSPECTOR ANALYST DMC
014-291 D 1942 Arzylowicz Zapatka 1,800,000
 Dunnigan 1,000,000
 2,300,000
 2,500,000
 910,000
 1,200,000
 1,400,000
 1,200,000
 1,800,000
 1,200,000
014-292 D 1947 Arzylowicz Kuester 9,800,000 4,700,000
 5,800,000 6,000,000
 Zapatka 840,000 910,000
 600,000 780,000
 600,000 260,000
 360,000 390,000
 4,900,000 1,600,000
 7,000,000 8,600,000
 5,400,000 9,500,000
 5,400,000 6,600,000
 2,900,000 3,800,000
 4,600,000 2,500,000
014-292 D Dunnigan 910,000
 1,300,000
 2,700,000
 520,000
 4,700,000
 7,700,000
 6,200,000
 4,700,000
 3,400,000
 2,300,000
006-296 D 1976 Scarbrough Debo 18,000,000
 26,000,000
 7,200,000
 6,500,000
 29,000,000
 16,000,000
 24,000,000
 7,900,000
 15,000,000
 6,800,000
 LeBlanc 6,200,000
 25,000,000
005-298 D 1010 Scarbrough Longbine 870,000,000
 1,100,000,000
 1,100,000,000
 1,100,000,000

*147
SAMPLE CAN COLLECTING
NUMBER CODE INSPECTOR ANALYST DMC
005-298 D 1010 Scarbrough Longbine 870,000,000
 1,200,000,000
 1,100,000,000
 1,200,000,000
 1,300,000,000
 1,100,000,000
 LeBlanc 5,600,000
 3,800,000
 4,600,000
 4,300,000
 7,900,000
 Gross LeBlanc 11,000,000
 6,100,000
 7,800,000
 6,100,000
 3,100,000
 7,900,000
 7,000,000
 6,100,000
 5,900,000
 5,300,000
006-298 D Debo 13,000,000
 5,900,000
014-293 D 1940 Arzylowicz Kuester 12,000,000 6,000,000
 14,000,000 3,400,000
 Zapatka 1,900,000 2,700,000
 1,800,000 3,600,000
 3,000,000 5,100,000
 840,000 2,000,000
 3,000,000 Unsatisfactory
 4,000,000 3,100,000
 720,000
 960,000
 720,000
 3,100,000
 Dunnigan 2,900,000
 2,600,000
 3,400,000
 1,600,000
 4,300,000
 3,900,000
 3,400,000
 2,900,000
 3,400,000
 4,700,000
014-294 D 1941 Arzylowicz Kuester 7,400,000 2,600,000
 7,900,000 1,300,000
 Zapatka 480,000
 240,000

*148
SAMPLE CAN COLLECTING
NUMBER CODE INSPECTOR ANALYST DMC
014-294 D 1941 Arzylowicz Zapatka 360,000
 480,000
 1,600,000
 480,000
 360,000
 240,000
 240,000
 240,000
014-294 D Dunnigan 390,000
 1,300,000
 390,000
 520,000
 1,000,000
 650,000
 390,000
 520,000
 390,000
 260,000
007-727 D 1938 Becker Debo 14,000,000
 7,200,000
 8,200,000
 11,000,000
 3,500,000
 2,600,000
 8,600,000
 2,600,000
 4,700,000
 2,100,000
 Longbine 19,000,000
 11,000,000
007-728 D 2920 Becker Debo 11,000,000
 27,000,000
 29,000,000
 28,000,000
 35,000,000
 31,000,000
 27,000,000
 29,000,000
 34,000,000
 34,000,000
 Longbine 13,000,000
 37,000,000
084-822 D 1935 Chambers Debo 780,000
 1,200,000
 31,000,000
 28,000,000
 1,700,000
 2,500,000
 2,100,000
 2,000,000

*149
SAMPLE CAN COLLECTING
NUMBER CODE INSPECTOR ANALYST DMC
084-822 D 1935 Chambers Debo 3,500,000
 5,100,000
 LeBlanc 980,000
 27,000,000

APPENDIX B

 CHRONOLOGICAL CHART OF DATES
 COVERED BY EVIDENCE OF PLANT CONDITIONS
GOVERNMENT GOVERNMENT PRODUCT CLAIMANT CLAIMANT
INSPECTIONS WITNESSES PACKED WITNESSES INSPECTIONS
June 11, 1969
June 21, 1969
Nov. 17, 1969
Nov. 18, 1969
Jan. 8, 1970
Jan. 21, 1970
Jan. 22, 1970
Jan. 27, 1970
Feb. 14, 1970
Mar. 13, 1970
Mar. 14, 1970
Mar. 18, 1970
 April, 1970 April, 1970 Jan. 21, 1970
 May, 1970 May, 1970 Jan. 22, 1970
May 15, 1970
May 16, 1970
 May 25, 1970
 May 26, 1970
 June, 1970 June, 1970
 June 26, 1970
 June 27, 1970
 June 29, 1970
 June 30, 1970
 July, 1970 July, 1970
 July 1, 1970
 July 2, 1970
 July 3, 1970
 July 6, 1970
 July 10, 1970
July 24, 1970 July 15, 1970
 Aug., 1970 Aug., 1970
 Aug. 1, 1970
 Aug. 3, 1970
 Aug. 21, 1970
 Aug. 22, 1970
 Aug. 26, 1970
 Aug. 28, 1970
 Aug. 29, 1970
 Oct., 1970
Jan. 19, 1971

NOTES
[1] What follows is designated as Findings of Fact and Conclusions of Law under Rule 52.
[2] Within the industry, they are ascribed such descriptive terms as "smalls", "dirties", "leakers", "molds", "checks", "fecals", "bloodies", "cracks", "mud-balls", "stains", "rots", and the like.
[3] According to the evidence at trial, repasteurization should remove all Salmonella organisms from a product provided they are not present in ordinately high numbers. Under these circumstances, the court could apparently order such remedial steps in lieu of destruction. 21 U.S.C. § 334(d) (1). Such action, however, would be inappropriate if the lot were otherwise adulterated.
[4] It is not contended that the eggs are "otherwise unfit for food" under the last clause of Section (a) (3). United States v. 24 Cases, etc., 87 F.Supp. 826 (D. Maine 1949).
[5] United States v. 1500 cases, etc., 236 F. 2d 208, 210-211 (7th Cir. 1956); United States v. 484 Bags, More or Less, 423 F.2d 839 at 841 (5th Cir. 1970).
[6] As precisely as the court recalls, the testimony regarding the meaning of decomposition was as follows:

"A condition which has adversely affected the quality of the product and may be injurious to health." (READ)
"A substance wherein there is a breakdown due to bacterial conditions which could be harmful or hazardous to health." (DUNIGAN)
"An undesirable chemical change in a product from the original form which offends or alarms the consumer or is evidential of a hazard to health." (ATKIN)
[7] Although in one criminal case, it was rejected as not meeting the higher burden of proof necessary to overcome the presumption of innocence. United States v. Commercial Creamery Co., 43 F.Supp. 714 (E.D.Wash.1942).
[8] Some inspectors use a sub-classification of "passable-abnormal" or "possible" for suspected but uncertain tests. The description of the government training and the testimony of all the witnesses gives the court no reason to discredit the reliability and fairness of qualified government inspectors in conducting such tests.
[9] See authorities collected in United States v. 484 Bags, More or Less, 423 F.2d 839 (5th Cir. 1970).
[10] The court believes it unwise to establish absolute quantity standards as a matter of law. As stated, a proper test might vary from product-to-product or case-to-case. In this instance, the court would have accepted 10% of the total number of cans, or 90% of the total samples as sufficient circumstantial evidence to conclude that the remainder of the lot was decomposed. Of course, the rejected cans in question would be condemned.
[11] Applied in United States v. 449 Cases, etc., 212 F.2d 567 (2d Cir. 1954) and United States v. 1,500 Cases More or Less, etc., 236 F.2d 208 (7th Cir. 1956).
[12] See Part III hereafter.
[13] The court is aware that at least one district opinion held without explanation or comment that a bacteria count of 5,000,000 per gram "is determinative of the presence of decomposed substances in the eggs within the meaning of 21 U.S.C.A. § 342(a) (3)." United States v. 310 Cans, More or Less, etc., 170 F.Supp. 16 (N.D. Ill.1959). The same findings established the validity of such a DMC count coupled with the acid tests. Assuming this duplication was not inadvertent, it is rejected for the reasons stated. Interestingly enough, it has not been accepted as an administrative tolerance by the Secretary under § 341.